GRAFF et al. v. PARKER BROS. & CO., Inc.
THE LAVINIA.

No. 14205.

United States Court of Appeals
Fifth Circuit.

June 5, 1953.

Rehearing Denied July 27, 1953.

M. M. Williams, T. G. Schirmeyer, and Williams, Jeter & Dobyns, all of Houston, Tex., for appellants.

Robert Eikel and Royston & Rayzor, all of Houston, Tex., for appellee.

Before HOLMES, BORAH, and RUSSELL, Circuit Judges.

BORAH, Circuit Judge.

This is an appeal from a final decree of the United States District Court for the Southern District of Texas dismissing an admiralty action to recover death benefits

under the provisions of the Texas death statute. Vernon's Ann.Civ.St.Tex. art. 4671.

Oliver J. Graff, the decedent, was drowned in the Houston Ship Channel on the night of September 5, 1949, when a 30 foot ferryboat on which he was the operator and sole occupant collided successively with the Tug Lavinia and the lead barge of her tow. Following this accident the widow and surviving heirs filed a libel for damages against the tug and tow and their owner, alleging numerous acts of negligence as having proximately caused Graff's untimely death. The respondent answered denying that it was negligent in the particulars charged and affirmatively alleged that the collision and its consequences were entirely attributable to the fault of the decedent. The cause came on for trial and the court found, after hearing the oral testimony and the evidence obtained by written interrogatory, (1) that the decedent was guilty of negligence in failing to keep a proper lookout which was a proximate cause of the collision; (2) that respondent was guilty of negligence in the operation of the Lavinia and her tow in failing to keep a proper lookout and in failing to have the lead barge adequately lighted, and (3) that each of the acts of negligence was a proximate cause of the collision. Having so found, the court concluded as a matter of law that libelants were not entitled to recover by reason of the contributory negligence of the decedent. This appeal followed.

The finding that the Lavinia and her tow were guilty of negligence is not challenged on this appeal and it is rightly conceded by the parties that in this action contributory negligence on the part of decedent will defeat appellants' right of recovery.[1] There accordingly remains for our consideration only the question as to whether or not the decedent negligently failed to maintain a proper lookout. In resolving this question we are mindful of the rule that the findings of the District Court when supported by the evidence will not or-

dinarily be disturbed on appeal. Mosher v. Parker Bros. & Co., Inc., 5 Cir., 178 F.2d 419; Escandon v. Pan-American Foreign Corporation, 5 Cir., 88 F.2d 276. We approach the problem in this light.

The collision in question occurred at a point 200 yards west of a tunnel which was then being constructed across the Houston Ship Channel in Harris County, Texas, eight miles east of the City of Houston. The accident was in the area where decedent, an employee of Harris County, customarily operated a small flat bottomed ferryboat. This ferry, 30 x 8 feet, was propelled by a Ford V-8, 85 horsepower motor, and was used as a public conveyance to transfer foot passengers across the channel during the period when the tunnel was under construction. The channel in the vicinity of the ferry slips runs approximately east and west, curving gradually to the northwest about one-quarter of a mile west of the slips and then curving sharply to the northeast beyond the tunnel site. The navigable waterway at the *locus in quo* has a bottom width of about 300 feet, a depth of 34 feet, and the overall distance from bank to bank is approximately 600 to 700 feet. On the north side of the channel there is a high bank or bluff and on the night of the fatal accident a dredge was lying in a cut on the north bank at the tunnel site with her pontoons extending into the channel. Several hundred feet west of the north slip and adjacent to the north bank a group of vessels was moored in the channel. On the south side, the bank is low and at the time in question the southern half of the channel was almost completely obstructed by a section of the tunnel which was suspended from barges. The dredging equipment and the tunnel section were electrically lighted and the north and south ferry slips were illuminated with lanterns. The night was dark but clear.

At about midnight on the day in question, the decedent, Graff, while standing on the bank above the north slip where the ferry was moored, received a lantern signal from

1. United States of America v. Waterman Steamship Corporation, 5 Cir., 190 F.2d 499; Truelson v. Whitney & Bodden Shipping Co., Inc., 5 Cir., 10 F.2d 412; O'Brien v. Luckenbach Steamship Co., 2 Cir., 293 F. 170; Quinette v. Bisso, 5 Cir., 136 F. 825, 5 L.R.A.,N.S., 303.

a prospective passenger on the opposite bank. He thereupon went down to the ferry landing boarded his vessel and cast off. The ferryboat, with her running lights burning, backed into the channel from the north slip in an easterly direction and then changed course to port and started across to the south side.

The Lavinia, a 200 horsepower diesel tug towing three light barges in tandem on a short hawser 12 to 15 feet astern, was then in the immediate area proceeding downstream in an easterly direction. The mate was at the wheel in the pilothouse and was also acting as lookout. Upon rounding the bend west of the ferry slip the Lavinia came on at her full speed of five miles per hour and was opposite the ferry landing when the mate first noticed the ferryboat, which was then only 10 to 12 feet from the tug and almost directly under the port window of the Lavinia's wheelhouse. The ferry then and at that moment turned to starboard and sideswiped the tug with her port side, scraped along the port forward corner and side of the lead barge, and then fell astern. No one was seen to fall or jump from the ferry and the mate was unable to see the ferry operator because a canvas canopy over the hull obstructed his view. Following the collision, the Lavinia immediately slowed her speed and notified the Lucita, a small tug engaged in patrolling the tunnel area, that a collision had occurred, after which she pulled her barges on down below the next bend, made them fast, and returned to the scene. Soon thereafter the ferryboat was recovered by the Lucita and it was discovered that the decedent was missing. When recovered, the engine of the ferry was running with the clutch in neutral and the ferry was undamaged except for a slight injury to the frame of the canopy, a broken windshield, and a damaged searchlight. Several days following the collision, decedent's body was recovered from the channel.

 Three witnesses besides the mate of the Lavinia were in a position to observe the events which transpired. Joe Mericle and J. F. Lambert were talking to the decedent before he was summoned to cross the channel and witnessed his departure as the tug and tow were passing but were not looking at the channel at the moment of impact, although their attention was soon thereafter directed to the participants in the collision. Robert Wolf, the waiting passenger, both saw and heard the accident. The evidence of these witnesses leaves us in no doubt that the tug was not only lighted but plainly visible. From a point near the surface of the water such as the decedent occupied when seated in the low, flat bottomed ferryboat, it was possible, according to the testimony, to see for a distance at least as far as the width of the 600 to 700 foot channel without the assistance of a light. Furthermore it appears that the tug had three white lights burning on her foremast, one on her aftermast, and in addition her running lights were burning and her galley was brightly lit. Appellant's only complaint in respect to the tug's lights is predicated upon the mate's statement—a mere supposition on his part—that the lights on the Lavinia's foremast were separated by 20″ intervals. Seizing upon this supposition, it is argued that the applicable Inland Rule, 33 U.S.C.A. § 173, requires 36″ intervals. This contention we think is completely without merit not only because the mate was not positive as to the distance but because the closeness of the interval between the lights made them none the less visible from the nearby ferry, and the fault, if any, could neither have caused the collision nor contributed thereto. The witnesses Lambert and Wolf saw the tug and tow before the collision and there is no reason why the decedent, had he been observant, could not also have seen them. The fact that the lead barge may have been improperly lighted was a mere condition and could not have misled the decedent, for it was not the lead barge with which the ferry first collided, but the well-lighted tug. The argument that the decedent was attempting to maneuver around the stern of the Lavinia will not do, for if he did make such an attempt he either knew or should have known that the tug was not proceeding alone as the three white lights showed that she was a towing vessel with one or more vessels astern. Inland Rules, 33 U.S.C.A. § 173.

Nor are we impressed by the argument that the decedent need not have anticipated that the Lavinia would be where she was since he had a right to expect that the tug and her tow would observe the Inland Rule which provides that "In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel." 33 U.S. C.A. § 210. We think that a prudent seaman operating a vessel in the much traveled waters of the Houston Ship Channel would not be justified in assuming that his observation need only be directed downstream on the supposition that all vessels upstream would be lawfully navigating on their starboard side of the channel. Here, careful observation was demanded since the southern half of the channel was obstructed and there was no reason to indulge in this expectation. In any event, there is no merit in the contention that the Lavinia and her tow close-shaved the ferry slip for the overwhelming weight of the evidence here shows that the flotilla at the time of the collision was near the center of the channel, at a place where she had a right to be and where she had to be in order to clear the floating tunnel section.

It is further argued that the bank at the point of the bend and the boats moored upstream west of the ferry landing blocked the decedent's vision so that the range of his visibility around the point of the bend was limited to 10 feet; that the Lavinia gave no whistle signal or gave an improper signal; and that there was no evidence to show that the decedent knew or should have known of the presence of the tug and tow. These contentions are without force. The record does not reveal either the actual height of the bank, its longitudinal extent, or whether the elevated portion of the bank actually extended as far as the bend west of the ferry landing. And, if the boats moored upstream blocked the decedent's vision, it is not shown to what extent it was so blocked. In any event, it cannot fairly be doubted that the peril would have been avoided if the decedent had been exercising the care called for by the attending circumstances, which were known to him. Fault on the part of the Lavinia in failing to blow her whistle, if fault there was, does not excuse the operator of the ferryboat. For even if the tug and tow could not have been seen from the ferry landing when rounding the bend, the flotilla was nevertheless near the center of the waterway and the decedent, after departing from the ferry slip, had ample opportunity to observe its presence and to stand clear. His keeping on, therefore, instead of stopping in time, could only proceed from gross neglect of timely precautions, or want of attention to the position of the tug and tow; for either of which he would be equally culpable.

In an effort to explain the collision, appellants argue that the decedent did observe the tug and either slowed down or was waiting for the tug to pass and that the ferry was sucked into the stern of the Lavinia by the tug's bow wave and the quick water from the tug's powerful propeller. This contention is based on the erroneous premise that the tug was near the north bank, and not in mid-channel where suction would doubtless be slight. It also completely ignores the fact that prudent navigation required that decedent maintain a safe and sufficient margin of safety to provide against this hazard, if such it was. Furthermore, this contention as here presented is only a hypothetical theory, and being unsupported by substantial evidence amounts to practically nothing.

In Truelson v. Whitney & Bodden Shipping Co., 5 Cir., 10 F.2d 412, where, as here, the claim asserted was based on the Texas death statute, we held that the operator of a motor launch who was knocked from his vessel and drowned while passing under a cable was negligent in failing to maneuver the vessel properly when ample room was afforded for him to do so. The conditions prevailing here were no different and the decedent was afforded equal opportunity to avoid colliding with the tug and the evidence clearly shows that his failure to exercise ordinary care for his own safety proximately contributed to his death.

The remaining contentions of appellants have been carefully considered but do not

merit further discussion. We hold that the findings of the District Court are amply supported by the record and should not be disturbed on this appeal. The judgment was clearly right and it is

Affirmed.