Ellen EMERSON, Claimant, Appellant,

v.

HOLLOWAY CONCRETE PRODUCTS COMPANY, Inc., Appellee.

No. 17839.

United States Court of Appeals Fifth Circuit.

June 29, 1960.

Alton G. Pitts (of Maguire, Voorhis & Wells), Orlando, Fla., for appellant.

Wilson Sanders (of Sanders, McEwan, Schwarz & Mims), Orlando, Fla., for appellee.

Before TUTTLE, JONES and BROWN, Circuit Judges.

JONES, Circuit Judge.

The appellee, Holloway Concrete Products Company, Inc., will herein be referred to as Holloway. It engaged in the concrete business and in the distribution of building material. Its principal place of business was at Orlando, Florida. Franklin Williamson was its president and general manager. Thomas C. Ross was its construction engineer. In the spring of 1954 Williamson negotiated for Holloway the purchase of the 27-foot inboard cruiser, the Overtime. The boat was powered by a gasoline motor. When not in use it was berthed at the Sanford Boat Works in Sanford, Florida. The boat was used, for a time after it was purchased, for the pleasure of Williamson and for the entertainment of customers. For about a year prior to July 4, 1957, the use of the boat by Williamson was negligible. Ross was free to use the boat and did frequently use it for himself and his family, and from time to time they would take customers or prospective customers of Holloway out on the boat. Ross, with the acquiescence of Williamson, assumed the responsibility for the maintenance of the boat.

On July 3, 1957, Ross was using the boat and had trouble with the bilge pump. The following day he went to the boat yard to remove the pump in order to have it repaired. At the invitation of Ross, his personal and business friend, Francis Emerson, went with him. Emerson was an architect practicing in the area in which Holloway was engaged in the concrete and building materials business. When Ross and Emerson went on the boat, it was found that water was standing in the bilge and Ross decided to pump the water out before removing the pump. The pump was electrically operated. In order to avoid draining the power of the batteries while operating the pump, Ross chose to run the engine so that the generator might keep the batteries charged. The electric hookup was such that one or the other of the two batteries might be operated but in normal operation both batteries were not in use at any one time. Ross attempted unsuccessfully to start the motor with one of the batteries. He then threw a switch which cut that battery out and cut the other in. It also was too weak to

start the motor. He then concluded that both batteries should be hooked together to get the engine running. This was not an unusual practice and a jumper wire was kept on board for that purpose. Ross knew, as did Williamson, that sparks would or might fly off as this operation took place. Starting the motor by the use of the jumper wire required two people, one to hold the wire against the poles of the batteries and the other to manipulate the starting mechanism. Ross asked Emerson to assist. As Ross was explaining the method of hooking the batteries together and showing him the process, an electric spark caused an explosion of gas in the boat's bilge, the boat took fire, burned, and sank. Emerson died from injuries received by him.

Judicial proceedings were initiated by the filing by Holloway of a petition for exoneration and for limitation of liability, under the Limitation of Shipowners' Liability Act, 46 U.S.C.A. § 182 et seq. A claim for damages to another boat was listed with the claim of Ellen Emerson, wife of Francis Emerson, for the wrongful death of her husband. Holloway proposed to convey the boat, then and thereafter at the bottom of the water in which it sank, to a trustee in discharge of its liability. Mrs. Emerson answered charging unseaworthiness and negligence, and denied the right of Holloway to the benefit of the limitation of liability. Mrs. Emerson filed a claim against Holloway for the negligent death of her husband asserting he was an invitee, that Holloway's negligence caused his death, and claimed damages in the amount of $200,000. To this claim Holloway filed an objection, saying its boat was seaworthy, and that the invitation of Ross to Emerson was not made in the scope of the employment of Ross. There was a denial of negligence of Holloway and its agents and employees.

The district court found that Ross, as an agent and employee of Holloway, had custody of the boat. It was found that Emerson voluntarily accompanied Holloway's agent Ross upon the boat, and that Ross, the agent of Holloway, was not guilty of any gross or wanton negligence with respect to Emerson. Having so found, the court determined as a matter of law that the claim of Mrs. Emerson had not been established. This appeal followed. On appeal it is urged that the question whether there is liability of Holloway to Mrs. Emerson is to be determined by the law of Florida; that Emerson was an invitee upon the boat but, whether he was an invitee or licensee, Holloway owed him a duty of reasonable care; that this duty was breached; that Emerson's death resulted from the negligence of Holloway's agent and employee; and that recovery should not be denied to Mrs. Emerson. The district court denied the petition of Holloway for limitation of liability. No appeal is before us with respect to this ruling.

■ The common law allowed no recovery for wrongful death. Dean Prosser has stated the rule and observed, "The result was that it was more profitable to kill the plaintiff than to scratch him, and that the most grievous of all injuries left the bereaved family of the victim, who frequently were destitute, without a remedy." Prosser on Torts, 2d ed. 710. And so in admiralty, in the absence of statute, the death of a person did not give rise to a cause of action, Norris, Maritime Personal Injuries, 361 et seq., § 125; The E. B. Ward, Jr., C.C., 16 F. 255. The remedy in England was provided by Lord Campbell's Act and each of the states has enacted a wrongful death statute. In the area of admiralty the Congress has created a cause of action for the death of seamen by the Jones Act, 46 U.S.C.A. § 688. A remedy for death on the high seas is provided by a statute known as the Death on the High Seas Act, 46 U.S.C.A. § 761 et seq. Emerson was not a seaman and the injury resulting in his death occurred on inland water. Neither of these statutes is available to Mrs. Emerson. Nor is she entitled to death benefits from the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq.

■ Where death occurs on, or as a result of injuries received on navigable waters within a state, as was the case here, admiralty jurisdiction exists to enforce the right created by the state statute. Where the injured person survives and is the plaintiff or libellant in admiralty the principles governing are the rules of maritime law rather than the state substantive law and the duties of the shipowner are not limited by the law of the state. From this it follows that the person injured has a right to a seaworthy ship, and common law distinctions between licensees and invitees are inapplicable. Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550. But where the action is for wrongful death the liability, although established and enforced in admiralty, is to be measured by state standards, and the issues are to be determined in accordance with the substantive law of the state. Any defenses which are available under the law of the state may be successfully interposed in the admiralty proceeding. Goett v. Union Carbide Co., 361 U.S. 340, 80 S.Ct. 357, 4 L.Ed.2d 341. Hess v. United States, 361 U.S. 314, 80 S.Ct. 341, 4 L.Ed.2d 305; The Tungus v. Skovgaard, 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524; Western Fuel Co. v. Garcia, 257 U.S. 233, 42 S.Ct. 89, 66 L.Ed. 210; Graham v. A. Lusi, Limited, 5 Cir., 1953, 206 F.2d 223; Graff v. Parker Bros. & Co., 5 Cir., 1953, 204 F.2d 705; Quinette v. Bisso, 5 Cir., 1905, 136 F. 825, 5 L.R.A., N.S., 303; 1 Benedict on Admiralty, 6th Ed. 392 § 148; Norris, Maritime Personal Injuries, 373 et seq. §§ 130, 131. This is true unless the state law has adopted the general maritime concepts of negligence applicable in the case of death resulting from a maritime injury, rather than its own standards of negligence liability. Goett v. Union Carbide Corp., supra.

■ The State of Florida has had for many years a statute [1] providing for an action by libel in rem or in personam by a widow [2] for the death of her husband caused by the negligence of a boat or of a person employed thereon. As the appellant has recognized, the problem here is to determine what law the courts of Florida would apply to the facts in this case if the case were presented in the courts of that state as an action for wrongful death. Such is the principle applied in the case of Graham v. A. Lusi, Ltd., supra, where it is held:

"The statute must be applied in admiralty just as if the suit had been brought in the state courts, and any defenses which are open to the appellee under the jurisprudence of the state, if successfully maintained, will bar recovery under the libel." 206 F.2d 223, 225.

In the Graham case the widow of the decedent sought to recover upon a showing that the injury resulting in death

1. "Whenever the death of any person in this state shall be caused by the wrongful act, negligence, carelessness or default of any individual or individuals, or by the wrongful act, negligence, carelessness or default of any corporation, or by the wrongful act, negligence, carelessness, or default, of any agent of any corporation, acting in his capacity of agent of such corporation (or by the wrongful act, negligence, carelessness or default of any ship, vessel or boat or persons employed thereon), and the act, negligence, carelessness or default, is such as would, if the death had not ensued, have entitled the party injured thereby to maintain an action (or to proceed in rem against the said ship, vessel or boat, or in personam against the owners thereof, or those having control of her) and to recover damages in respect thereof, then and in every such case the person or persons who, or the corporation (or the ship, vessel or boat), which would have been liable in damages if death had not ensued, shall be liable to an action for damages (or if a ship, vessel or boat, to a libel in rem, and her owners or those responsible for her wrongful act, negligence, carelessness or default, to a libel in personam), notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances as amount in law to a felony." Fla.Stat.1959, § 768.01, F.S.A.

2. Fla.Stat.1959, § 768.02, F.S.A.

was caused by unseaworthiness. Under the maritime substantive law unseaworthiness would have given the injured person a right of action even though the injured plaintiff was guilty of contributory negligence and the defendant shipowner had used due care. In holding contrary to the plaintiff's contentions, this Court, in the Graham case, said:

"There is a complete absence of merit in appellant's attempt to avoid the foregoing defenses by invoking a right of action for unseaworthiness which, being a right of action the deceased might have maintained had he simply been injured and lived, is clearly not preserved by the legislative enactment under which appellant proceeds." 206 F.2d 223, 225.

As in the Graham case where unseaworthiness alone did not allow recovery under the Florida statute and contributory negligence could be asserted as a defense, so here the defendant shipowner must be permitted to assert whatever distinction there may be under the Florida law between the duty owed to an invitee and the duty owed to a licensee.

The answers to the state law questions seem to be found in the recent opinion of District Court of Appeal of Florida in the case of Cochran v. Abercrombie, 118 So.2d 636, 637. In its opinion the Florida precedents are discussed and the principles of the law of that state which control our decision are set forth. There the plaintiff alleged that he went to the residence of the defendant for the purpose of discussing a proposed fishing trip. While there the defendant requested the plaintiff to step over to the carport for the purpose of looking over the motor of the defendant's automobile. The defendant raised the hood and, while leaving the plaintiff in front of the car observing the motor, which was not then running, the defendant opened the car door and engaged the starter of the car which was in forward gear. The car lurched forward injuring the plaintiff. The complaint alleged that the defendant's conduct was done negligently and without warning. The factual similarity to the case before us is apparent. The Florida trial court held that there could be no recovery because the plaintiff was merely a licensee to whom the defendant owed no greater care than to refrain from wilfully or wantonly causing him injury. The trial court dismissed the complaint and the District Court of Appeal affirmed.

The courts of Florida make a distinction between the duties owed by the owner or occupier of property to trespassers, licensees and invitees. The duties owed to each of these classes are set forth in the court's opinion in Cochran v. Abercrombie, supra, by the following quotation from McNulty v. Hurley, Fla., 97 So.2d 185:

" 'The duty owed by the owner or occupant of premises to each class of persons is also distinct. The duty owed by the owner or occupant to the trespasser is to refrain from committing a wilful or wanton injury against him with the rule being softened after discovery by the landowner of peril to the trespasser. Byers v. Gunn, Fla.1955, 81 So.2d 723.

" 'The duty owed a licensee is to refrain from wanton negligence or wilful misconduct which would injure him, or to refrain from intentionally exposing him to danger. City of Boca Raton v. Mattef, Fla. 1956, 91 So.2d 644. There may be a further duty to the licensee to warn him of a defect or condition known to the owner or occupant to be dangerous when such danger is not open to ordinary observation by the licensee. [Citing authorities.]

" 'A greater duty is owed to an invitee than to either of the other class of persons above mentioned. The owner or occupant owes an invitee the duty of keeping the premises in a reasonably safe condition, and, as plaintiff contends, also to guard against subjecting such person to dangers of which the owner or oc-

cupant is cognizant or might reasonably have foreseen.' " [Citing authorities.] 118 So.2d 636, 637.

The Florida court, in its Cochran v. Abercrombie opinion, had occasion to define "licensee" and to distinguish a licensee from an invitee. The Court said:

"A 'licensee' has been broadly defined as 'a person who enters upon the property of another for his own convenience, pleasure, or benefit.' Stewart v. Texas Co., Fla.1953, 67 So.2d 653, 654. 'An invitee is normally considered to be one who enters upon the premises of another for purposes connected with the business of the owner or occupant of the premises.' City of Boca Raton v. Mattef, Fla., 1956, 91 So.2d 644, 647. That the plaintiff was a licensee on the facts stated has been determined by the trial court, and this, we think, is well supported by the cases collected in 25 A.L.R.2d 598, notwithstanding the fact that at the time of his injury he was carrying out a request by the defendant. The courts of various jurisdictions have held that incidental motives of the visit of a social guest, other than purely social ones, will not be sufficient to characterize the visitor as an 'invitee'. These cases also indicate that minor services performed by the guest for the host during the visit will not be sufficient to change his status from licensee to invitee or business visitor." 118 So.2d 636, 637–638.

Although the decedent, Emerson, at the time of receiving the injury that resulted in his death, was carrying out a request of his host and performing a minor service for him, Emerson was nevertheless a licensee and not an invitee. There was no wilful or wanton misconduct and no condition of danger known to Ross of which he should have warned Emerson. Under the law there can be no recovery and that law is controlling of our decision.

The appellant makes one further point by urging that there was negligence of Ross which was affirmative or active and that in such a case recovery may be had even though there was no wilful or wanton negligence or misconduct. This doctrine and the application of it, or rather the lack of application of it in Florida, is also discussed and decided in Cochran v. Abercrombie, supra. From that opinion we again quote:

"Many jurisdictions follow the rule that the possessor is under a duty to both licensees and trespassers to abstain from 'active' as opposed to 'passive' negligence. Some of the cases clearly distinguish this rule from the 'wilful and wanton injury' rule. Other cases combine the two rules, without distinction. In support of the classification of active and passive negligence the plaintiff has called our attention to the annotation which appears in 156 A.L.R. at page 1228, where the annotator has cited cases decided by the U. S. Courts of Appeal and the Courts of California, District of Columbia, Nevada, Illinois, Minnesota, New York, North Carolina and Pennsylvania.

"While no Florida cases have been cited in the briefs of either plaintiff or defendant where the facts are similar to those in the instant case, we feel that the case of Pensacola, St. Andrews & Gulf S.S. Co. v. Austin, 1912, 63 Fla. 241, 58 So. 611, 613, precludes our adopting the 'active' and 'passive' negligence theory which is urged by the plaintiff. In that case the negligence of the defendant can be classified as 'active', although the words 'active' and 'passive' were not used to distinguish the types of negligence. The negligence involved in the instant case would undoubtedly be held in the jurisdictions which have adopted the 'active' and 'passive' negligence theory to be 'active' negligence. Following the reasoning in the Pensacola, St. Andrews & Gulf S.S. Co. v.

Austin case, supra, then, we must decline to adopt from other jurisdictions the 'active' and 'passive' negligence theory." 118 So.2d 636, 638–639.

Since the Florida court has declined to adopt the "active" and "passive" negligence theory we cannot apply it in a case which is governed by the laws of that state.

From what has been said it follows that the judgment of the district court must be and it is

Affirmed.

JOHN R. BROWN, Circuit Judge (dissenting).

To the natural cynicism of Dean Prosser echoed by the Court's quotation:

"The result was that it was more profitable to kill the plaintiff than to scratch him, and that the most grievous of all injuries left the bereaved family of the victim, who frequently were destitute, without a remedy."

may be added another. As he would say, it is more profitable to kill a man than destroy property. For the maritime tort which killed Emerson and which was brought about solely because Emerson, pursuant to request, was doing a task indispensable to Ross' work, destroyed seven nearby motor yachts and a shipyard. The District Court allowed a recovery of $36,384.71 (including $15,000 in hull underwriters subrogation) for this property damage. Holloway, the petitioner, was denied the right to limit liability because the fault and neglect of Ross was with the privity and knowledge of the corporate owner of the M/Y Overtime.

The Court approaches it this way: being a maritime death action we must decide what the Florida *courts* would say. Having gotten that far, and ignoring the plain words of the Florida Death Statute, the Court then proceeds to declare, not what the Florida courts would hold, but what this Court one time said. Taking Graham v. A. Lusi, Ltd., 5 Cir., 1953, 206 F.2d 223, decided in 1953 as the law of the Medes and Persians which altereth not, the Court then makes the pronouncement that as was a claim of unseaworthiness without fault, or one involving contributory negligence on the part of the decedent, not within the Florida statute, so too must be one in which status—licensee—for a land-based Florida injury would prevent recovery.

My bewilderment can be quickly pinpointed: what has happened to the Florida legislature? Is it not the Act—not what judges say of it—that controls?

My view is that the Florida Death Statute has spelled it out in the most unmistakable manner. The test of a survivor's death recovery is this simple query: could the deceased have recovered had he survived and sued? And for maritime injuries resulting in death Florida has made that query even more specific: could the decedent have recovered in an admiralty proceeding *in rem* against the vessel or *in personam* against the owner or operator? When it comes to the answer to that question, the facts show glaring negligence and in no sense was the casualty the result of that sort of unseaworthiness—liability without fault—considered by us in Graham, supra.

I.

The Court's opinion gives quite a different impression. Reading it one would suppose that there were but two claims —one for Emerson's death and the other for damage to a single vessel. More so, as to them the opinion merely reflects with an almost classic understatement that the District Court "denied the petition of Holloway for limitation of liability." That could occur from a variety of reasons, not the least of which might be a technical failure to comply with statutory requirements on time, surrender of vessel, inadequate ad interim stipulation and the like. Oil Transport Co. v. Verret, 5 Cir., 1960, 278 F.2d 464. This is far from the case. What happened was that the District Court denied it on the merits on the ground that the corporate shipowner through its presi-

dent, Williamson, and through Ross to whom the management of the M/Y Overtime was committed as ship's husband, had privity and knowledge of the fault.

This was a substantial catastrophe. In response to the monition and restraining orders there were seven claims and answers filed to the petition for limitation of shipowner's liability besides that for Emerson's death. These were for the destruction of the motor vessels "Beltz—Beatty," the "Mike," the "Rainbow," the "Dreamgirl," the "Joyce Ann," and the "Hilda" (and hull underwriters' subrogation) and destruction of the Sanford Boat Works where the M/Y Overtime was kept. After the trial on liability vel non and right to limit participated in by all claimants including Emerson, the District Court held that this fire and explosion occurred with the privity and fault of Holloway, the corporate shipowner. Exoneration from and right to limit liability were denied. All claims (save Emerson's) were then referred to a Commissioner upon whose award a final decree was entered for $36,384.74 including interest.[1]

The Court's opinion is accurate in stating in a negative way that the trial court "found that Emerson voluntarily accompanied Holloway's agent Ross upon the boat, and that Ross, the agent of Holloway, was not guilty of any gross or wanton negligence with respect to Emerson." But the record tells much more,[2] and both the uncontradicted evidence and the District Judge's statements in the record reflect that the fire and explosion was the result of active[3] negligence on the part of Ross.

As this record comes to us, this was a crude setup. On at least a dozen occasions the batteries had proved inadequate. It was necessary to use the jumper wire. Even the president had witnessed the operation and had acknowledged that sparks were produced. Of course, the sparks were either in or right over the bilge areas where gasoline fumes would frequently accumulate. To those owed the duty of seaworthiness, cf. United New York and New Jersey Sandy Hook Pilots Ass'n v. Halecki, 1959, 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed. 2d 541, and West v. United States, 1959, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161,

1. Utilizing Rule 23 of this Court, 28 U.S. C.A., I have examined the entire record of the limitation proceedings in the District Court of which the instant appeal is an integral part. In addition to the claims allowed, the final decree exempted from the final restraining order several late filed claims thus permitting such claimants to proceed in state court actions against the vessel owner.

This record included as well all of the testimony formally incorporated within our record but, as encouraged by our Rules for reducing expense, not printed. An appeal has been taken from that final decree by petitioner. My comments concerning the evidence are not a prejudgment. They are intended merely as a statement of what the District Court was entitled to find especially in view of the fact that in our case no attack is made by petitioner (appellee) on the evidence and finding of fault.

2. In the formal findings of fact the District Court, concerning the jumper wire setup, had this to say: "The method

thus used to start the motor was calculated to and often did produce sparks capable of igniting any sufficient accumulation of gasoline fumes present in the area of the batteries. * * * The explosion and fire was the result of the ignition of accumulated fumes by means of the sparks caused by the use of jumper wires." Upon that the Judge concluded that this "unsafe and dangerous method * * * made the boat unseaworthy * * *" which "condition * * * known to Williamson * * *" was with the "knowledge and privity" of petitioner.

3. I use this in the sense of liability with fault to distinguish it from those instances in which liability without fault may flow from a breach of the absolute warranty of seaworthiness. I do not use it in the sense of an exception to the rule on licensees which, as the Court points out, Florida rejects in Cochran v. Abercrombie, Fla.App., 1960, 118 So. 2d 636, at pages 638–639.

such a system with its known deficiencies made the vessel unseaworthy. But it was not a static condition or one for imposition of liability without fault, see Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941. The use of this nondescript method causing the vessel to be unseaworthy in an operational as well as legal sense was, at the same time, negligence of the most patent sort.

With a gasoline engine it was impossible to avoid some leakage or resulting gasoline fumes. In optimum mixture of very small parts, this is highly explosive. Two witnesses of unusual technical qualification as experts testified without any contradiction whatsoever that the use of this "bailing wire" jumper system was fraught with great danger of explosion.[4]

And the District Judge expressly thought of this in terms of negligence, i. e., specific acts of commission or omission. His unqualified declarations are as much a part of the record as the formal findings of fact, note 2, supra. They show that he was acutely aware of the problem for legal decision. After extended arguments of counsel on the substantial question of privity and knowledge, the Judge called for briefs. But as the underlying basis for the briefs, he several times announced that he was holding that Ross was guilty of negligence proximately causing the damage.[5] This left then for briefs only the question whether petitioner was charged with privity and knowledge of Ross' negligence.[6]

## II.

Consequently, we do not have, as one might infer from the casual nature of the opinion, damage and death caused only by unseaworthiness without fault. We have damage due to specific conduct of Ross (chargeable to Williamson) which the Court found to be both negligent and a kind of which the shipowner had personal complicity.

Would Emerson have been entitled to recover had he lived? The Court almost —but not quite—says as much.[7]

But the Court really never answers this question. All that it does is place

4. One was Captain Lemay, a marine surveyor since 1933 with an experience covering over 38,000 vessels. "Any time you touch the terminal in a battery" you know that "you certainly will * * get a spark." The rule of seagoing safety is positive. It "is important in marine safety not to have any sparks in the bilge." That means "not to have any sparks, absolutely not, that is the first lesson * * *."

The other was Commander Thompson, office of Marine Inspection Service, U.S. Coast Guard, at Jacksonville. He emphasized the danger of gasoline vapors and the necessity for extreme precaution concerning sparks. He was emphatic that "it is not" a " * * * * safe practice to hook the poles of batteries together by an open wire below the deck of an inboard boat" because "you are bound to create a spark" and "if the gasoline vapors are in the right quantity * * * you will have an explosion."

5. The Court stated: "Now on the issue of unseaworthiness and/or the issue of negligence on the part of Ross at the time of the accident, the Court is prepared to make a finding now in the affirmative of that issue; that is to say, that the boat involved in the accident was unseaworthy and that Ross was negligent at the time and place and under the circumstances * * *."

6. The Court put it this way. "But whether that negligence [of Ross] is imputable to the petitioner * * * the Court is not at this time prepared to decide." That, he said, "is a question of law" on "the issue of whether there is knowledge and privity on the part of the petitioner * * * so as to make petitioner liable for the negligence of Ross * *."

7. The Court states "Where the injured person survives and is the plaintiff or libellant in admiralty the principles governing are the rules of maritime law rather than the state substantive law and the duties of the shipowner are not limited by the law of the state. From this it follows that the person injured has a right to a seaworthy ship, and common law distinctions between licensees and invitees are inapplicable. Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550." 282 F.2d 271 at 275.

great store [8] on the statement by us in Graham, supra [206 F.2d 225]:

"The statute must be applied in admiralty just as if the suit had been brought in the state courts * * *."

Actually, this is no test at all. It either begs the question or in the light of the decisions of the past few years it is simply wrong. The injuries being maritime a Florida state court would be bound by the maritime law.[9]

And at least one thing we know positively. Status as an invitee or licensee is irrelevant to the maritime law insofar as maritime injuries are concerned. The shipowner owes the duty of due care to each alike. This was the precise holding of Kermarec v. Compagnie Generale Transatlantique, 1959, 358 U.S. 625, 79 S.Ct. 406, 408, 3 L.Ed.2d 550. The opinion first demonstrates that it does no good to make a theoretical assessment in terms of what would have occurred in a state court since, if the action "had been brought in a state court, reference to admiralty law would have been necessary to determine the rights and liabilities of the parties." 358 U.S. 625, at page 628, 79 S.Ct. 406, at page 408, 3 L.Ed.

2d 550, at page 553. And without a doubt Emerson comes within the Court's declaration. "We hold that the owner of a ship in navigable waters owes to all who are on board for purposes not inimical to his legitimate interests the duty of exercising reasonable care under the circumstances of each case." 358 U.S. 625, at page 632, 79 S.Ct. 406, at page 410, 3 L.Ed.2d 550, at page 555.

For maritime injuries, the maritime law supplies the sole standard. This includes cases pending either in the state court or as a civil action based on diversity. "Whatever doubt may once have existed on that score was effectively laid to rest by Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 410–411, 74 S.Ct. 202, 204, 98 L.Ed. 143." Kermarec v. Compagnie Generale Transatlantique, supra, 358 U.S. 625, at page 628, 79 S.Ct. 406, at page 409, 3 L.Ed.2d 550, at page 553.

What does death do? I would not here try to fashion a consistent mosaic [10] from the momentary, shifting, sometimes conditional concurrences among the several Justices which now make up the Court's view.[11] The common core is the recognition by all that the maritime

---

8. See Court's opinion, 282 F.2d at 275.

9. The latest, but probably not the last, expression leaves no doubt as Hess v. United States, 1960, 361 U.S. 314, 80 S.Ct. 341, 345, 4 L.Ed.2d 305, at page 309, makes plain. "Graham's death and the wrongful act or omission which allegedly caused it occurred within the State of Oregon * * *. Since death occurred on navigable waters, the controversy is, as the trial court correctly held, within the reach of admiralty jurisdiction * * *. Oregon would be required, therefore, to look to maritime law in deciding it * * *." And to that text in footnote 7, 80 S.Ct. 345, 4 L.Ed.2d at page 310, the Court continued. "There can be no question but that Oregon would be required to apply maritime law if this were an action between private parties, since a tort action for injury or death occurring upon navigable waters is within the exclusive reach of maritime law * * *." The dissenting opinion of Mr. Justice Harlan is even more emphatic on ad-

miralty supremacy. 80 S.Ct. 341, 347, 4 L.Ed.2d 305, 312.

10. See Thibodeaux v. J. Ray McDermott & Co., 5 Cir., 1960, 276 F.2d 42, see note 6 at page 47.

11. The Tungus v. Skovgaard, 1958, 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524; United New York and New Jersey Sandy Hook Pilots Ass'n v. Halecki, 1959, 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed.2d 541; Hess v. United States, 1960, 361 U.S. 314, 80 S.Ct. 341, 4 L.Ed.2d 305; Goett v. Union Carbide Co., 1960, 361 U.S. 340, 80 S.Ct. 357, 4 L.Ed.2d 341.

Justice Whittaker now limits his prior concurrence to state statutes as a remedial supplement to the substantive maritime law. Justices Harlan and Frankfurter think that the substantive maritime law is so controlling that the states may never impose a greater burden than would the substantive maritime law. Justices Stewart and Clark would allow states to add substantive duties provided only that the state innovations are not offensive to admiralty. And the so-called

law ultimately controls the area in which the states may operate and the extent to which the so-called state substantive standards are to be followed as the guide.

As of the present moment the principle that musters a working majority can be stated briefly. The right effectively to recover for maritime death depends on a state death statute. The federal admiralty court (or in civil actions in diversity cases) may enforce these rights. What those rights are depends on the state statute or, wherever necessary, the construction put upon the state statute by the courts of that state. In this approach the state has the power to incorporate or adopt within its death statute substantive maritime law principles of negligence and unseaworthiness. If it does, then the survivors will recover, as would the decedent, on admiralty principles whether in a state court, a federal diversity civil action, or the admiralty. Otherwise, if the state confines the standard to that for non-maritime common law situations, the admiralty takes the case with all of the limitations and defenses of the right under that interpretation.

It is a question, then, of the terms of the state death statute or, where needed, the interpretation and construction of that statute by the state judiciary.

## III.

Here the Florida Death Statute is plain and it is remarkably precise as the interpolated brackets in note 12 reflect.[12]

All doubt is eliminated as to parties who are to be held legally accountable. These include specifically [1a] individuals, [1b] corporations, and [1c] corporate agents. To these is then added [1d] a ship and all persons employed thereon. But it is even more refined, for the statute speaks in terms of the legal remedies open to the decedent had he survived. These specifically include the right to [2a] maintain an action to recover damages. Of decisive importance, they specifically cover his right to [2b] proceed by libel *in rem* against a vessel or [2c] *in personam* against her owner or operator. With equal precision it speaks in terms of specific categories of those entries having a legal liability for such injuries had death not ensued. The op-

---

minority (The Chief Justice and Justices Black, Douglas and Brennan) who now join Justices Stewart and Clark, or Clark alone, under compulsion of Tungus to make a majority are of the view that state death statutes supply a mechanism to permit admiralty to vindicate rights consistent with general maritime concepts without regard to state restrictions.

12. "Right of action for death.—
Whenever the death of any person in this state shall be caused by
   [1a] the wrongful act, negligence, carelessness or default of any individual or individuals, or
   [1b] by the wrongful act, negligence, carelessness or default of any corporation, or
   [1c] by the wrongful act, negligence, carelessness, or default, of any agent of any corporation, acting in his capacity of agent of such corporation (or
   [1d] by the wrongful act, negligence, carelessness or default of any ship, vessel or boat or persons employed thereon),

and the act, negligence, carelessness or default, is such as would, if the death had not ensued, have entitled the party injured thereby to
   [2a] maintain in action (or to
   [2b] proceed *in rem* against the said ship, vessel or boat, or
   [2c] *in personam* against the owners thereof, or those having control of her)
and to recover damages in respect thereof, then and in every such case the person or persons, who [1a,c], or the corporation [1b] (or the ship, vessel or boat) [1d], which would have been liable in damages if death had not ensued shall be liable to
   [3a] an action for damages (or
   [3b] if a ship, vessel or boat, to a libel *in rem*, and
   [3c] her owners or those responsible for her wrongful act, negligence, carelessness or default, to a libel *in personam*),
notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances as amount in law to a felony."
Florida Stat. § 768.01, F.S.A.

erative result is then defined in like terms. It specifies that those in category [1a, b, c, d] causing injuries which entitle the injured person to resort to remedies in category [2a, b, c] for recovery of damages shall be liable to [3a] in action for damages or [3b] a libel *in rem* or [3c] a libel *in personam*.

The statute makes a triple approach to the problem in terms of the party or thing inflicting the wrong, the rights of the injured person had he survived, and the legal remedies available for redress. In each category specific note is taken of maritime injuries and the unique remedies known only to the admiralty (see [1d], [2b], [2c], [3b], [3c]). In this respect it has few counterparts in state death statutes. Except for Virginia[13] with which it is almost identical, and somewhat similar provisions in Maryland,[14] Mississippi,[15] and Oregon,[16] no other state death statutes speak in terms of specific admiralty remedies or maritime substantive rights.[17]

Unfortunately, (or fortunately depending on how one looks upon these things, see Commissioner of Internal Revenue v. Acker, 1959, 361 U.S. 87, 80 S.Ct. 144, 4 L.Ed.2d 127, 132, dissenting

13. Code of Virginia. "Article 3. Death by Wrongful Act. § 8–633. Action for death by wrongful act.—Whenever the death of a person shall be caused by the wrongful act, neglect, or default of any person or corporation, *or of any ship or vessel*, and the act, neglect, or default is such as would, if death had not ensued, have entitled the party injured to maintain an action, *or to proceed in rem against such ship or vessel or in personam against the owners thereof or those having control of her*, and to recover damages in respect thereof, then, and in every such case, the person who, or corporation or ship or vessel which, would have been liable, if death had not ensued, shall be liable to an action for damages, or, *if a ship or vessel, to a libel in rem, and her owners or those responsible for her acts or defaults or negligence to a libel in personam*, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances, as amount in law to a felony. * * *" (Emphasis supplied.)

14. This statute is set out in State v. Weyerhaeuser S.S. Co., D.C.Md.1959, 176 F.Supp. 664, at page 665, see also note 18, infra. This statue allows recovery if death is "caused by wrongful act, neglect or default" and such as would "have entitled the party injured to maintain an action," then "the vessel or person who would have been liable * * * shall be liable * * * and if death ensues as a result of wrongful act, neglect or default of a vessel, suit may be brought in rem against said vessel * * *." Code Md.1957, art. 67, § 1.

15. "§ 1565. Judgment—liability of ships and vessels for causing death or injury.

"Whenever the death of a person shall be caused by the wrongful act, neglect, or default of any ship or vessel, and the act, neglect, or default is such as would (if death had not ensued) have entitled the party injured to maintain an action, or to proceed in rem against the said ship or vessel, or in personam against the owners thereof, or those having control of her, and to recover damages in respect thereof, then, in every such case the ship or vessel, which, had not death ensued, would have been liable to an action for damages, or to a libel in rem, and her owners, or those responsible for her acts or defaults or negligence to a libel in personam, shall be liable for all damages notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances as amount in law to a felony." 2 Miss.Code (1942) § 1565.

16. "Liens on Boats and Vessels

"783.010 Claims for which liens accorded. Every boat or vessel used in navigating the water of this state or constructed in this state is liable and subject to a lien * * *

"(4) * * * for damages or injuries done to persons or property, by such boat or vessel, and for damages or injuries by such boat or vessel resulting in the death of any person." Ore.Rev. Stat. (1959) § 783.010. See also Ore. Rev.Stat. (1959) 30.010–30.100.

17. Ala.Code 1940, Tit. 7, § 123;
Ariz.R.S. §§ 12–611—12–613 (1956);
3 Ark.Stat.Annot. 27–906 (1959 Supp.);
14 Calif.Code Annot., CCP §§ 376, 377 (1954);
Colo.Rev.Stat.1953 § 41–1–1 to § 41–1–2;
Conn.Gen.Stat.1958, § 52–555;
Del.Code Annot., Title 10, § 3704 (1953);
Ga.Code Ann. §§ 105–1301 to 105–1309;
Idaho Code, §§ 5–310 to 5–311 (1948);

opinion), no formal legislative history is available. But it can be said of this Florida statute what the Fourth Circuit recently said of Virginia's. That Court in Holley v. The Manfred Stansfield, 4 Cir., 1959, 269 F.2d 317, 320, held that under the Virginia Act, note 13, supra, the trial court's finding of contributory negligence did not bar recovery for a maritime death.[18] Of the statute the Court remarked, "It is too obvious to escape attention that the statute was drafted by one well versed in admiralty law." 269 F.2d at page 320.

Now all of this has decisive significance both affirmatively and negatively. The Florida standard of recovery[*] for death is the vicarious right to proceed by libel *in rem* or *in personam*. The term "libel" is one of art for the traditional pleading of the party seeking relief. A admiralty libel *in rem* requires a lien either implied by the maritime law or pursuant to a statute, state or federal. But

S.H.A.Ill.Stat., ch. 70 §§ 1, 2 (1959);
Ind.Stat.Annot. § 2–404 (1959);
Iowa Code Annot. 613.11, 635.9, R.C.P. 8, 58 I.C.A. (1950);
Kan.Gen.Stat.1949, §§ 60–3201, 60–3203, 60–3204;
Kentucky Rev.Stat.1959, § 411.130;
LSA–C.C. Art. 2315 (1952);
Maine Rev.Stat.1954, Ch. 165, § 9;
Mass.Gen.Law Annot. 229:1–11 (1958);
Mich.Stat.
Annot. § 27.711 (1959 Supp.), Comp. Laws 1948, § 691.581;
Minn.Stat.Annot. § 573.02 (1960 Supp.);
Mo.Stat.Annot. § 537.080 (1959 Supp);
Mont.Rev. Code Annot.1947, § 93–2809, § 93–2810;
Neb.Rev.Stat.1956, § 30–809;
Nev.Rev.Stat. 12.080, 12.090, 41.080;
N.H.Rev.Stat.Annot.1955, 556:12 to 556:14;
N.J.Stat.Annot. § 2A:31–1 (1952);
N.M.Stat.Annot., 1953, § 22–20–1;
McKinney's Consolidated Laws of New York, Annotated, c. 13, Decedent Estate Law, §§ 130–134 (1949);
N.C.Gen.Stat. § 28–173 (1959 Supp.);
N.D.Rev.Code 1943, 32–2101 to 32–2106;
Ohio Rev.Code Annot. § 2125.01–§ 2125.-04 (1954);
Okla.Stat.Ann., Title 12, § 1053 (1959 Supp.);
Purdon's Pa.Stat.Annot. 12, §§ 1601 to 1604 (1953);
R.I.Gen.Laws 1956, 10–7–1 to 10–7–9;
S.C.Code 10–1951 (1952);
S.D.Code 37.2201, 37.2203 (1952 Supp.);
Tenn.Code Annot. 20.607 (1959 Supp.);
Tex.Civ.Stat., Arts. 4671, 4672;
Utah Const., Art. XVI, § 5;
Vt.Stat.Annot., 1959, 14, §§ 1491, 1492;
Wash.Rev.Code 4.20 (1958);
W.Va.Code 1955, § 5477;
Wisc.Stat.Annot. 331.03 (1958);
Wyo.Stat.1957, 1–1065.
Some of the statutes, e. g. Tex.Civ. Stat., Art. 4671, make specific reference to "vessel," "steamboat," or similar term.

18. In the 1959 annual survey of American Law, 35 N.Y.U.L.Rev. (1960), Nicholas J. Healy, 3rd, in Admiralty and Shipping, pages 587–599, at pages 597–598 reports: "Following the Supreme Court's decision in The Tungus v. Skovgaard, a number of lower courts were quick to hold that the wrongful death statutes of various states were worded broadly enough to include a cause of action for death resulting from unseaworthiness." To this is appended footnote 56. "See, e. g., Holley v. The Manfred Stansfield, 269 F.2d 317, 1959 AMC 2189 (4th Cir.), certiorari denied [Reederei Blumenfeld, G. M. B. H.] 361 U.S. 883 [80 S.Ct. 154, 4 L.Ed.2d 119] (1959), interpreting Va. Code Ann. § 8–633 (1957); [State of] Maryland ex rel. Gladden v. Weyerhaeuser S.S. Co., 176 F.Supp. 664, 1959 AMC 1380 (D.Md.1959), interpreting Md.Ann. Code art. 67, § 1 (1957)."

To these may be added

Aldrdige v. States Marine Corp. of Delaware, 9 Cir., 1959, 265 F.2d 554, in which the Ninth Circuit reversing dismissal of a complaint reserves the question of contributory negligence under the California Death Statute until trial on the merits.

The Texas Court of Civil Appeals in Vassallo v. Nederl-Amerik Stoomv Maats Holland, 1960, 337 S.W.2d 309 has just held that the state death act, Arts. 4671, 4672, does not absorb the maritime doctrine of comparative fault and contributory negligence is a complete bar.

The New Jersey statute is set out in The Tungus v. Skovgaard, 1959, 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524 at note 7. Both the Second and Third Circuits have construed this act as incorporating the doctrine of unseaworthiness and in Halecki the Supreme Court approves the Second Circuit's construction that the maritime principle of comparative fault would apply to decedent's contributory negligence.

a statutory lien, as has long been established, can be enforced only in admiralty.[19] That means that the Florida reference to the vicarious standard contemplated admiralty proceedings. This is of crucial importance since in any such supposed admiralty proceeding it is clear that the maritime, not Florida, substantive law would control. Florida would be powerless to prescribe any standard of lesser liability. Specifically Florida could not, by legislation or judicial decision, impose on the admiralty any common law status concepts of invitee, licensee, or trespasser, Kermarec v. Compagnie Generale Transatlantique, supra, or contributory negligence as a complete bar. Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143. Having prescribed two distinctive types of admiralty proceedings, it is unreasonable to assume that Florida contemplated that in such proceedings, substantive law other than maritime would control. The Constitution would forbid anything else as Florida well knew.

And viewing it affirmatively the specific reference to such admiralty proceedings reflects a purpose on Florida's part to extend to survivors whatever benefit the substantive maritime law would have afforded for maritime injuries. This was a natural thing since Florida has extensive maritime interests. And anyone familiar enough with admiralty to distinguish carefully, as this Act does, between *in rem* and *in per-*

*sonam* libels, would know instinctively that its purpose was to *broaden,* not restrict, the rights of recovery. As an immediate objective the Act sought the great advantages of financial security in the maritime lien, the *in rem* proceeding, the flexibility of *in personam* actions with writ of foreign attachment without the cumbersome bonding and similar requirements under state garnishment proceedings and the like. And most clearly in mind must have been the maritime law's historic view on contributory-comparative negligence and the sweeping protection of the concept of the warranty of seaworthiness.

As the test for maritime death damage recovery, the Florida statute asks a simple question: could the injured person have recovered had he sued in admiralty? The answer is equally simple.[20]

Florida has therefore exercised the choice allowed to it by the maritime law. The "State might apply the substantive law generally applicable to wrongful death cases within its territory, or it might choose to incorporate the general maritime law's concepts of unseaworthiness or negligence." Goett v. Union Carbide Corp., 1960, 361 U.S. 340, 80 S.Ct. 357, 358, 4 L.Ed.2d 341, at page 343. It has done so in unmistakable language which leaves no place for judicial interpretation, much less an uncritical acquiescence in a former 1953 decision which, like Goett v. Union Carbide Corp.,

19. See Gilmore & Black, Admiralty §§ 1–13, 9–24 to 9–29 (1957); The Moses Taylor, 1867, 4 Wall. 411, 71 U.S. 411, 18 L.Ed. 397; The Hine v. Trevor, 1867, 4 Wall. 555, 71 U.S. 555, 18 L.Ed. 451; Madruga v. Superior Court, 1954, 346 U.S. 556, 74 S.Ct. 298, 98 L.Ed. 290; Pascogoula Dock Station v. Merchants & Marine Bank, 5 Cir., 1959, 271 F.2d 53, 57, footnote 3.

20. The answer is not found, as would usually be the case, by a vicarious determination of what some other court would hold. For whatever doubt there might be theoretically is dispelled by the actual final decree allowing recovery for property damage. The District Court, as a constitutional court of admiralty having jurisdiction over the whole limitation proceeding, Pershing Auto Rentals, Inc. v. Gaffney, 5 Cir., 1960, 279 F.2d 546, and not sitting as a mere Erie adjunct to state courts, Levinson v. Deupree, 1953, 345 U.S. 648, 73 S.Ct. 914, 97 L.Ed. 1319, has held as a matter of maritime substantive law that the conduct of petitioner gave rise to the right to recover damages for the maritime tort inflicted upon the floating vessels. Under the maritime law Emerson would fare as well as a vessel. If any different factors would apply to the claim for $6,088.20 for nonmaritime damage to Sanford Boat Works, we need not consider them here.

supra, decided by the Court of Appeals in 1958, (4 Cir., 256 F.2d 449) was without the benefit of Tungus and Halecki.

So long as the Tungus standard remains, it is a question of state law. The state law is here found in the statute. We cannot make state law, nor can we by one or a dozen opinions eradicate the positive terms of the statute. The statute does not say that death damages shall be allowed "if the suit had been brought in the state courts" or that in such action "any defenses which are open * * * under the jurisprudence of the state * * * will bar recovery under the libel." See note 8, supra. This is an impermissible judge-made amendment to Florida legislation.

The Florida statute asks: could Emerson have recovered in admiralty?

The Court never answers that question.

I therefore dissent.