James Walter TRUITT, a minor, by Howard Truitt, his next friend, and Pearl L. Truitt and Howard Truitt, individually, Plaintiffs,

v.

Russell Lowell GAINES, Defendant.

Civ. A. No. 2150.

United States District Court
D. Delaware.

Aug. 23, 1961.

This is a diversity action for personal injuries suffered by James Walter Truitt, a minor, and Pearl L. Truitt, his mother, and for expenses by and loss of consortium for Howard Truitt, father of the minor and husband of Pearl L. Truitt. De-

fendant, Russell Lowell Gaines, a school teacher, resides in Delaware.

There were three defenses raised at trial: 1. Plaintiffs lived in Delaware at the time of institution of suit—hence, no diversity; 2. at the time of injury, plaintiffs mother and son were guests without payment riding in defendant's motor vehicle within the meaning of 21 Delaware Code, § 6101 (the Guest Statute) and are thus barred from any recovery for negligence; and 3. defendant was not guilty of any negligence.

Harold Leshem and H. B. Rubenstein (Leshem & Rubenstein), Wilmington, Del., for plaintiffs.

Ernest S. Wilson, Jr., Wilmington, Del., for defendant.

LEAHY, Senior District Judge.

1. *Citizenship* of plaintiffs at the time of filing suit has been put in issue.

*Findings.* On April 21, 1947, the Truitt family moved to a farm of George E. Wright in Maryland.[1] On December 1, 1959 this action was brought. On December 5, 1959, Truitt made arrangements to move his family to the farm of J. Lee Phillips in Delaware.[2] The next day, on a Sunday, December 6, 1959, Norman E. Hubbard, plaintiffs' minister, who lived in Princess Anne, Maryland, visited the Truitts on the Wright farm in Maryland.[3] On Monday, the next day, the Truitt family moved to the Phillips farm in Delaware.[4] Later that week, on December 12, 1959, the Truitts' mailman was advised they had moved.[5] From the facts, it appears that the Truitts at the time the action was filed were citizens of Maryland and defendant was a citizen of Delaware.[6] The amount in controversy exceeds $10,000.[7]

█ *Opinion.* Testimony of plaintiff Truitt and the minister Norman E. Hubbard establishes that on December 1, 1959 (filing of the complaint) plaintiffs were citizens of Maryland and had lived there on the Wright farm for 13 years. On Sunday, December 6, 1959, Mr. Hubbard remembers visiting the Truitts and learned they were moving the next day. The minister remembers specifically because the following day, December 7, was Pearl Harbor Day and he had occasion to attend an affair of the American Legion. Truitt had been planning to move for some time, but he did not make up his mind until December 5, 1959.

Defendant put in evidence James', the son's, school attendance record. It was a sheet of paper with the notation at the top reading: "Truitts moved today 11–30–59;" at the right of the page there is a notation: "According to the information given me on 11–30–59 by Hermon [sic] and Perline [sic] Truitt, the Truitt family moved on 11–30–59." Defendant school teacher testified this was a record kept in the regular course of his duties. Source of the information was that the Truitt children told him several days before November 30, 1959, i. e., they were going to move to Delaware on December 1, 1959. Defendant entered the notation of an event, in an official record, presumably before the event, in fact, had occurred. A shadow lies across the reliability of the record. No effort of confirmation was made by defendant. No reference even appeared to the new Delaware address of the Truitt family, although such incomplete notation on an official school document was in violation of instructions of the State Board of Education as it might be important in event of emergency to get in communication with parents.[8] Moreover, nowhere on the attendance record does the year 1959 appear except as cited above. Clearly, defendant had no actual knowledge of the Truitt family moving. At trial, although the attendance record was admitted into evi-

1. Finding of Fact, Transcript 18–19.

2. FF. Tr. 17–18.

3. FF. Tr. 5–6, 26, 61–62.

4. FF. Tr. 3, 4, 5, 9–10.

5. FF. Tr. 22.

6. FF. Tr. 218. See, too, Pretrial Order ¶ (c) (1).

7. FF. Tr. 218, ibid. ¶ (c) (2).

8. PX 5–IIA.

dence, over objection, I observed, at the time,[8a] the written-in notation of what someone else told defendant does not cure the vice of hearsay as to the writing if judged for its probative worth. The school-record notation does not show the Truitts left Maryland. Thus, it is just as reasonable to assume the Truitts remained in Maryland on December 1, 1959 as it is to assume a withdrawal from there on that date. Defendant's motion for dismissal for lack of diversity is denied.

2. *Guest Status.* The critical issue in the case at bar—a question of law—is whether plaintiffs are barred by the Delaware Guest Statute. But, the determination of the question of law must invariably rest on adequate facts.

*Findings.* Plaintiff, the son James, attended the Owens Corner Elementary School located in Sussex County, Delaware,[9] and situated between Delmar, Delaware, and Sharptown, Maryland.[10] The brown shingle school is small, rural, and has only two rooms.[11] The children are taken to and from school in a bus.[12] A schoolyard has equipment for recess play-periods.[13] The school grades are from 1 through 6, and for 1958–59 there were about 50 students.[14] Defendant Gaines became a teacher at the school in 1957 at which time there was only one other teacher.[15] In 1958–59 a Miss Neal replaced the other teacher, through grades 1 to 3; she had no teaching experience; and plaintiff James was in her class.[16] While the school had no principal,[17] ad-

ministrative decisions, without opportunity to consult a higher official, were made by the teacher with the greater experience.[18] There was no school nurse.[19] If a student was injured or ill in school, the student would be taken to a doctor or to his home by a teacher or parent if motor transportation was available;[20] first aid would be applied by a teacher.[21] The policy of the Board of Education was *the first consideration must be the child's welfare.*[22]

There was a rural elementary supervisor with jurisdiction over the Owens Corner School and all state board unit schools (40 schools) in Sussex County;[23] but it was impossible for such official to visit each school unit each month;[24] so, between visits, normal affairs are handled by the teachers and, if a child is injured, the situation is met without guidance from the supervisor.[25] The only other teacher, Miss Neal, looked to defendant Gaines for help and the benefit of his experience and advice.[26]

James was 10 years old and a retarded child[27] and had difficulty in grasping even the fundamentals. Miss Neal often discussed with defendant Gaines her particular problems with James.[28] In short, James required specialized and personalized attention.[29] Defendant recognized his responsibility to the retarded child—greater than to average children—and he would hold conferences with parents of such a retarded child,[30] such parent-teacher conferences being held at the school or at the home of the particular

8a. FF. Tr. 120.
9. FF. Tr. 28.
10. FF. Tr. 155, 161.
11. FF. Tr. 161.
12. FF. Tr. 161–162.
13. FF. Tr. 163.
14. FF. Tr. 163.
15. FF. Tr. 155, 164.
16. FF. Tr. 68, 134, 135, 156, 157.
17. FF. Tr. 44.
18. FF. Tr. 44–45.
19. FF. Tr. 45.
20. FF. Tr. 46.
21. Id.
22. FF. Tr. 47–48; PX 5–IID.
23. FF. Tr. 28, 48.
24. FF. Tr. 49.
25. Id.
26. FF. Tr. 157, 159–160.
27. FF. Tr. 164–165, 167.
28. FF. Tr. 167–168.
29. Id.
30. FF. Tr. 130.

child especially in a rural area where transportation for parents was difficult or impossible.[31] Defendant Gaines admits he might have visited James' home on occasions prior to the injury sustained by the boy while at school.[32] This incident occurred in November 1958 while the boy was playing in the school yard during the lunch period.[33] Defendant and Miss Neal were both in the school eating lunch,[34] when James came in crying and said he was hurt.[35] Defendant, after discussion with Miss Neal, stated he would take James home in defendant's car, as there was no other transportation or way to obtain medical care,[36] as this was part of his responsibility as teacher.[37]

James did not return to school and defendant and Miss Neal discussed his prolonged absence.[38] It was decided the visiting teacher (acting as truant officer and social worker) should be notified,[39] which was done; [40] but the visiting teacher was busy at the time and it was understood he [or she] would investigate the situation as soon as possible.[41] As stated, under such circumstances, the senior teacher at the particular school performs the visiting teacher's duties to determine the pupil's absence.[42] In fact, the Board of Education encourages teachers to take the initiative in situations where the work force is not available.[43]

The absence continuing, defendant states Mrs. Truitt sent him a message James was not getting better and asked defendant to visit him.[44] The visiting teacher had not yet appeared so defendant and Miss Neal went to James' home [45] to verify the pupil's absence,[46] and found James there with his ankle still swollen.[47] Several days later the mother sent a note James was not getting any better and medical attention was necessary.[48] Still the visiting teacher had made no appearance, so defendant notified James' mother he would be at her home the next day and take the boy to a doctor.[49] Defendant, concerned with James' absence and aware of a sense of responsibility to the retarded child, on the next day went to the Truitt home for the purpose of taking James to a doctor.[50] He arrived between 6 and 7 P. M., and left with James and his mother for the doctor.[51] [His action he stated was a benefit to the education system, to the school, and to his responsibilities and duties as a teacher. Tr. 190.]

This leads to certain subjective or inference facts. Defendant felt James was staying out of school too long for his injury,[52] but, at the same time, defendant felt a personal responsibility for James' injury since it occurred in the school yard when both defendant and Miss Neal were inside the school eating,[53] and it was his job to supervise the children during school hours.[54] Feeling a personal responsibility, he wanted the pupil to obtain prompt medical care.[55] In fact, de-

---

31. FF. Tr. 169–170.

32. FF. Tr. 170.

33. FF. Tr. 170–171.

34. FF. Tr. 171.

35. FF. Tr. 170, 172.

36. FF. Tr. 172, 173.

37. FF. Tr. 49, 173.

38. FF. Tr. 140, 182.

39. FF. Tr. 30–31, 52, 182.

40. FF. Tr. 178, 179, 183.

41. Id.

42. FF. Tr. 31, 51–52, 53–55.

43. FF. Tr. 55–57.

44. FF. Tr. 176.

45. FF. Tr. 145, 153, 176, 178, 183.

46. FF. Tr. 140, 184.

47. FF. Tr. 177.

48. FF. Tr. 179, 181.

49. FF. Tr. 180, 181.

50. FF. Tr. 184, 185, 186, 187, 189.

51. FF. Tr. 188. Although defendant characterized his action as a humanitarian gesture, he admits that, as a responsible teacher, he also did it to alleviate James' medical condition and hasten his return to school. Tr. 188, 190.

52. FF. Tr. 190.

53. FF. Tr. 190–191.

54. FF. Tr. 190–191, 206.

55. FF. Tr. 192. Apparently from the day of injury the boy had received no medical attention whatsoever.

fendant loaned Mrs. Truitt $2 to pay the doctor's bill.[56, 57]

Absenteeism is regarded as a serious problem by the Board of Education; responsibility is placed on school administrative personnel to assure validity of absences from school; primary responsibility is upon parents, but teachers in charge have a policy demanding opposition to unnecessary and uninterrupted absences.[58] In case of illness, the child's welfare is a first consideration.[59] From his own statements, defendant, here, has dedicated himself to the profession of teaching, desires to become a better teacher, and make a better contribution to the education of his children.[60] At the time of the motor accident [described infra] defendant's presence in his own car with Mrs. Truitt and her son James on his way to the doctor was neither for pleasure nor companionship; he took the pupil for medical care to promote the mutual interests of both himself and them.[61]

■■ *Opinion.* One of the purposes of the Delaware Guest Statute is to prevent collusion between the host and guest for the purpose, for example, of defrauding casualty insurance companies,[62] and to protect a person who without any benefit to self transports another.[63] But, the purpose of this type of insulating statute is not extended beyond the evils for the correction of which they were designed,[64] for the guest statutes, in derogation of the common law, are strictly construed against owner and operator.[65]

■ Acknowledged authority has defined a guest to include only a person who rides for nothing and to exclude from the operation of the statute those who ride with the host for a common purpose other than pleasure. 2 Harper & James, The Law of Torts, 961. There was never a legislative intent to deny a right of action to a person who was being transported, in any sense, for the benefit of the owner or operator; e. g., where the transportation is for mutual benefit, the guest relationship does not, in law, exist.[66] Payment of money for the ride is not necessary to negate guest relationship.[67] The courts look to what the owner-driver expected or hoped to benefit from the transportation.[68]

■ Just what benefit to driver-owner constitutes a payment in order to remove passengers from classification of guest has been the subject of voluminous judicial opinions. Confusion in the area is avoided by distinguishing situations involving contracts to pay for transportation from cases involving no such con-

56. FF. Tr. 196, 197.
57. It is to be noted teachers' salaries are statutory, but the State School Board may vary the schedule to include supplemental compensation. Tr. 29. An oblique fact is defendant was aware a teacher could be dismissed for neglect of duty or negligence. Tr. 50, 198–200.
58. FF. Tr. 200; PX 5.
59. FF. Tr. 200–201; PX 5.
60. FF. Tr. 205.
61. FF. Tr. 207, 208.
62. Gallagher v. Davis, 7 W.W.Harr. 380, 37 Del. 380, 183 A. 620, 622; McHugh v. Brown, 11 Terry 154, 50 Del. 154, 125 A.2d 583, 588; Wilson v. Workman, D.C. Del., 192 F.Supp. 852, 855. See, also, Blashfield, Cyc. of Automobile Law and Practice, § 2313, p. 362, n. 16.
63. Robb v. Ramey Associates, Inc., 1 Terry 520, 40 Del. 520, 14 A.2d 394, 396; Colombo v. Sech, Del.Super., 163 A.2d 270, 272; Wilson v. Workman, supra.
64. Robb v. Ramey Associates, Inc., supra; Colombo v. Sech, supra.
65. Blashfield, op. cit., supra, p. 363, n. 17; 60 C.J.S. Motor Vehicles § 399(3), p. 996.
66. Stevenson, Law of Negligence in the Atlantic States, § 721; Blashfield, op. cit., supra., § 2292, p. 305 et seq. See cases collected on Guest Statutes in 59 A.L.R.2d 336.
67. Engle v. Poland, 8 Terry 365, 47 Del. 365, 91 A.2d 326, 328; Elliott v. Camper, 8 W.W.Harr. 504, 38 Del. 504, 194 A. 130, 133; Wilkes v. Melice, 9 Terry 206, 48 Del. 206, 100 A.2d 742, 744.
68. Affiliated Enterprises, Inc. v. Waller, 1 Terry 28, 40 Del. 28, 5 A.2d 257, 260; Robb v. Ramey Associates, Inc., supra.

tracts,[69] and a recognition that guest status [70] does not exist where transportation promotes the material (felt?) needs of both passenger and owner or operator.[71] Status can only be ascertained by a careful case by case analysis of the relative relationship which exists between the persons in the motor car and a study of the benefits, indigenous to both driver and passenger, accruing as a result of that relationship.[72] To ascertain the benefits to defendant, in the instant case, the master facts adduced at trial must be examined.

In the case at bar, defendant argues any benefit he may conceivably have received on the motor trip with the plaintiff-passengers was a "psychic or spiritual pay-check" (benefit) which would not be recognized by the Delaware Courts as sufficient to take the plaintiffs who rode with him out of the guest class.

69. Asmuth v. Kemper, Del.Super.Ct. (July 6, 1961) 174 A.2d 820, is the most recent Delaware case interpreting the Delaware Guest Statute. But, there Judge Christie was concerned under the particular facts presented, as he wrote, "Distinction must be made between cases involving an enforceable agreement to share expenses of an automobile trip and those in which there is merely voluntary payment of expenses or part of them by a rider not in liquidation of a contractual liability, but in return for favors of a host as a matter of social amenity as, for illustration, by way of paying for a meal." The Asmuth case has no relevancy to the problem posed *sub judice.*

70. Whether a person is a "guest" under the statutes, the identity of the person transported must be examined. E. g., a seventh-grade pupil and a member of his school basketball team was held *not* a guest of the defendant, his coach, in his automobile returning from a game. Whittecar v. Cheatham, 226 Ark. 31, 287 S.W.2d 578. See, also, 5A Am.Jur., Automobiles and Highway Traffic, § 521, p. 560; Annotation, 59 A.L.R.2d 336.

71. Defendant admits, in the case at bar, "payment" under the Delaware cases "does not necessarily represent cash in hand," but relies on Judge Layton's statement in Wilkes v. Melice, 9 Terry 206, 48 Del. 206, 100 A.2d 742, 744, that "[payment] should represent a consideration of some substance. Otherwise the sound reasons motivating the passage of our guest law would be subverted."

Defendant's main reliance is on Klatka v. Barker, 124 Colo. 588, 239 P.2d 607, 610, involving driver and passenger enroute to attend a community band concert and competition. The Court said: "Any personal satisfaction which defendant may have derived from gratification of his part in furtherance of a community enterprise cannot be interpreted as 'a payment' under our guest statute." And, also, on 4 Blashfield, Cyc. of Automobile Law and Practice, § 2292, page 320: "[T]he benefit accruing or conferred upon the operator of the vehicle, sufficient to take the person riding with him out of the guest class, must be a tangible one growing out of a definite relationship."

72. In applying these principles of legal relationships, the Supreme Court of Ohio finding benefit to driver-owner (Burrow v. Porterfield, 171 Ohio St. 28, 168 N.E. 2d 137, 144–145) said:

"In the application of such principles to the case at bar, can it be said as a matter of law that the head of a children's division of a church was not benefiting her pastor in a business or material sense by riding in her pastor's automobile, at his urging and invitation, in order to attend a church conference which dealt with matters of importance to the head of a children's division of a church? Could reasonable minds not find that such transportation was in fact motivated by the hope and expectations of receiving such benefit? We are of the opinion that reasonable minds could so find, and it is our belief that reasonable minds might also find that such a rider was benefiting the pastor in his capacity as head of the church. A pastor is obviously vitally interested in improving his church and the adequacy of its functions; indeed, it is his business to strive for such improvements. If the attendance of church leaders and workers at an educational conference, such as the one involved herein, would benefit a church, reasonable minds could find that a pastor, as head of a church and the single person most responsible for the success of church activities, would also materially benefit from the attendance of such persons.

We are of the opinion, therefore, that *it was prejudicial error* for the lower courts, to hold, in effect, that *reasonable minds could come to the single conclusion* that the plaintiff's decedent, Mary K. Gill, accepted the ride in Porterfield's car solely for her own pleasure or business and conferred no return benefit upon the pastor except the mere pleasure of her company." (Emphasis added.)

Defendant was the senior teacher in a rural Negro segregated district school. As there were a small number of pupils, attendance was important. As the educational facilities were so niggard in this area, retarded children were mixed with the normal, and James, here, (a retarded child) required and received greater personal attention. His prolonged absence from school was a matter of no little importance to these two dedicated teachers. The failure of the visiting or supervising teacher to ever appear on the scene prompted defendant to do something about the absence of James. Such absence, he felt, reflected on his competency, as teacher, to perform his function. In observing Mr. Gaines at trial and on the stand, I concluded he wanted to find out why James did not come back to school. After the visit when he discovered the injured condition of the boy, he wanted to secure for the child proper medical care to make the child's return to school as soon as possible. Examining the teacher's dedication to help the children of his race, the taking of the boy for medical help was a tangible thing, substantial because it related to defendant's employment as a teacher. Counsel for defendant, arguing in contradiction of the incident, isolates the journey to the doctor as an act based on a feeling of helpfulness in an atmosphere of benign humanitarianism. True, defendant's gesture was rare in today's hard-boiled world. But, it was the result of complex and intermingling forces—obviously, not for the purpose of pleasure and not alone out of a feeling to be helpful, for it did bestow upon defendant a benefit in furtherance of his professional duties and responsibilities directed toward one of his retarded children. Under the statute, mother and son did not have guest status in defendant's motor vehicle within the meaning of the Delaware statute.

■ 3. *Negligence and Findings.* Defendant drove Mrs. Truitt and James to the doctor in Delmar, Delaware, on the evening of December 3, 1958, at about 7:30.[73] They were there about a half-hour.[74] As they drove home, it was dark, wet and foggy [75] along Route 16 in Delaware on a two-lane cement paved road.[76] In front of them was a tractor-trailer truck.[77] Defendant had been following the truck for some time at 40 or 45 m. p. h.[78] Then it rained hard.[79] Visibility was still fair.[80] Finally, defendant decided to pass the truck, but he could not estimate how far he was behind or how far ahead he could see as he was moving.[81] The truck was going about 40 m. p. h.[82] The road was straight.[83] Defendant crossed into the opposite lane, went off the shoulder of the road,[84] but continued his speed as his car went into the soft sand next to the shoulder.[85] As he was passing the middle point of the truck, at about 45 m. p. h.,[86] he struck a stone abutment adjacent to the side of the road.[87] [The distance from the point where defendant's front wheel left the cement portion of the road to the point of impact with the stone abutment was 697 feet.[88] Most of this distance was beyond the shoulder of the road.[89] The paved portion of the road was 15 feet wide.[90] The tractor-trailer was about 8 feet wide. [91]]

73. FF. Tr. 195–196.

74. FF. Tr. 197.

75. FF. Tr. 222.

76. FF. Tr. 100, 123.

77. FF. Tr. 224.

78. FF. Tr. 225.

79. FF. Tr. 99.

80. FF. Tr. 226.

81. FF. Tr. 227, 229.

82. FF. Tr. 228.

83. FF. Tr. 229.

84. FF. Tr. 230.

85. FF. Tr. 230.

86. FF. Tr. 231.

87. FF. Tr. 100.

88. FF. Tr. 99.

89. Id.

90. FF. Tr. 100, 104.

91. FF. Tr. 104.

Although defendant was familiar with this stretch of road,[92] he admitted the possibility, in attempting to pass the truck, he misjudged the width of the road,[93] did not have control of his car at all times,[94] maintained a constant speed of 45 m. p. h. from the time he pulled out to pass, and neither applied his brakes nor slowed his car.[95]

Defendant, after the accident, was arrested for speed greater than was reasonable and prudent under the driving conditions, and for not driving on the right side of the road under conditions warranting it—he entered a plea of guilty to both charges.[96]

The findings of negligence in the case at bar which constitute the factors causing the accident are:

1. Driving at a speed greater than reasonable under the conditions presented and having regard to the actual and potential hazards then existing;[97] 2. failing to drive at reduced speed when special hazards existed by reason of weather and highway conditions;[98] 3. failing to drive on the right half of the highway;[99] 4. in driving on the left of the center line, in overtaking and passing another vehicle, when the left side was not sufficiently visible to permit such passing to be made in safety;[100] and 5. for ordinary negligence in failing to keep and maintain a proper lookout and failure to have his car under proper control.

4. *Damages and Findings.* The factors making up this item are substantial.

■ (a) Plaintiff Pearl L. Truitt suffered severe injuries, viz.: fractured pelvis with dislocated right femur, the head of the femur crushed through the acetabulum of the pelvis, laceration of the chin, severe laceration of the tongue, and cerebral concussion.[101] She was taken to the Peninsula General Hospital in Salisbury, Maryland, in considerable distress, spitting blood.[102] X-rays showed fracture of the acetabulum (socket into which the leg bone fits) and that the head of the leg bone had been driven through the pelvis fracturing its bones.[103]

[The pelvis' function is to support the body and for attachment of muscles to the lower legs.[104] Where impaction of the head of the femur through the pelvis occurs, there is attending tearing of muscles and tendons in that area [105] while muscles and tendons may be, in time, replaced, scar tissue forms which is not as pliable as the original tissue.[106] The healing of the bone with the soft tissue around the head of the bone leads to thickening and loss of motion of the hip joint.[107]]

After surgical procedures and nature's healing, X-rays two months later disclosed the socket had healed, but visible fracture lines indicated the bone had not entirely returned to its original position.[108] Throughout the period, Mrs. Truitt was in constant pain which required medication.[109] Clinical notes: considerable nausea 5 to 7 days;[110] considerable loss of blood from tongue requiring transfusion; [111] tongue and mouth greatly swollen requiring nasal oxygen through nasal tube to assist breathing; [112] IV fluids since swollen condition of tongue

92. FF. Tr. 232.

93. FF. Tr. 234.

94. FF. Tr. 100, 235.

95. FF. Tr. 235–236.

96. FF. Tr. 103, 218; PX 6; Pretrial Order ¶ (c) (3) (4).

97. Violation of Del.Code § 4125(a).

98. Ibid. § 4125(b).

99. Ibid. § 4130(a).

100. Ibid. § 4133(c).

101. FF. Tr. 76–77, 87.

102. FF. Tr. 237, 238.

103. FF. Tr. 78; PX 1.

104. FF. Tr. 79.

105. FF. Tr. 79–80.

106. FF. Tr. 80.

107. FF. Id.

108. FF. Tr. 81, 82; PX 2.

109. FF. Tr. 82, 240–242.

110. FF. Tr. 82.

111. FF. Tr. 82.

112. FF. Tr. 82.

prevented normal taking of nourishment.[113]

Her tongue was severely lacerated—9 tubes of black silk were required to sew it together.[114] Although the tongue has healed, protrusion of scar tissue through the lacerated area (½″ by 1″ in size) in her mouth interferes with her method of speaking and eating.[115] Surgical procedures for repair work will take about 5 days further hospitalization.[116]

At the time of hospital discharge on December 24, 1958, Mrs. Truitt was unable to walk without assistance, as she had a cast covering one side of her body from her rib cage down to and covering her right leg.[117] The cast caused great discomfiture and prevented sleep.[118] After removal of the cast on February 2, 1959, she began, on February 17, to walk on crutches; and since the injury was at a joint the potential of progressive traumatic arthritis will result and worsen.[119] She still had pain, as late as March 1961, as a result of minimal shortening compensated by a slight tilt of her pelvis.[120] Medical opinion declares the injuries are permanent in nature with a present permanent partial disability of loss of use of her right hip of about 30%.[121]

 (b) The young boy, James Walter Truitt, suffered severe injuries also, including multiple fractures of the jaw bone and lacerations of the right side of the mouth.[122] He was taken to the same hospital with his mother.[123] X-rays disclosed fractures through both jaws and also in the middle of the lower jaw.[124] The fractures were reduced and the teeth wired together to hold the jaws in place.[125] Several teeth were lost, and more removed during the surgical operations.[126] Discharged December 18, 1958,[127] at the present time he is unable to eat hard food and is on a special diet.[128]

(c) Life expectancy of Pearl L. Truitt from time of accident is 39 years; James Walter Truitt, 58.35 years.[129] The following are the stipulated medical expenses as to Pearl L. Truitt: [130]

The Peninsula General Hospital,
 Salisbury, Maryland ........ $617.00
Philip A. Insley, M.D.,
 Salisbury, Maryland ........ 150.00
Accurate Optical Company .... 20.50

In addition, Mrs. Truitt will have a necessary future medical expense of about $400.00.[131]

As to James Walter Truitt: [132]

The Peninsula General Hospital,
 Salisbury, Maryland ........ $570.05
J. J. Tamasi, M.D.,
 Salisbury, Maryland ........ 70.00
Philip A. Insley, M.D.,
 Salisbury, Maryland ........ 25.00
Harold E. Matlack, D.D.S.,
 Salisbury, Maryland ........ 525.00

 *Opinion.* The injuries sustained to mother and son are severe and with the accompanying pain and suffering a verdict is justified in their favor. The medical expenses incurred by Howard Truitt, husband and father, are stipulated and noted, supra; and he has lost and will continue to lose the consortium and serv-

113. FF. Tr. 82.

114. FF. Tr. 83.

115. FF. Tr. 83, 238, 244, 245.

116. FF. Tr. 83.

117. FF. Tr. 84.

118. FF. Tr. 84, 243–244.

119. FF. Tr. 85, 86.

120. FF. Tr. 86.

121. FF. Tr. 86–87.

122. FF. Tr. 87.

123. FF. Tr. 88.

124. FF. Tr. 87–88, 92; PX 3, 4.

125. FF. Tr. 88.

126. FF. Tr. 88.

127. FF. Tr. 88–89.

128. FF. Tr. 247–248.

129. FF. Tr. 218; Pretrial Order ¶ (c) (6), (7).

130. FF. Tr. 217–218; Pretrial Order ¶ (c) (5).

131. FF. Tr. 83–84.

132. FF. Tr. 217; Pretrial Order ¶ (c) (5).

ices of his wife.[133] The testimony of the physicians, medical and dental surgeons for plaintiffs, is uncontradicted as to the serious nature of the injuries suffered by mother and son. The quality of such testimony is given high effect.[134]

5. *Medical Expenses.* These were stipulated at $1,977.55. Defendant had a liability policy. In addition to the main coverage the insurer agreed to pay to any person necessary medical expenses for bodily injuries caused by accident while occupying the owned motor vehicle being used by the insured—$500 to each person. Liability and medical payments coverage are in separate parts of the policy and each is supported by a separate consideration. Defendant's insurer met, in part, its obligation to plaintiffs by payment of $1,000 under the medical payments coverage of the policy. Plaintiff Howard Truitt, who is legally responsible for the medical expenses incurred by his wife and son, sues seeking, as part of his damages, medical expenses of $1,977.55.

Plaintiff-husband relies on the collateral source doctrine, viz.: a tortfeasor cannot benefit by an independent payment from a collateral source; so, regardless of the $1,000 already received, he is entitled to recover medical expenses in the instant action. Defendant's position is, since this plaintiff has already received $1,000 under the medical payments coverage of his policy, any verdict given in the case at bar which includes medical expenses should be reduced by that amount. The issue arises, here, because the insurer carries both medical and liability coverage. As quantum of damages is substantive, Erie applies. But, there is no Delaware authority either direct or oblique. Hence, this phase of the discussion rests, at best, on an informed guess as to what the Delaware courts would do under similar facts.

Severson v. Milwaukee Automobile Insurance Company, 265 Wis. 488, 61 N.W. 2d 872, 42 A.L.R.2d 976, is regarded as a leading case. The insurer paid a judgment recovered by plaintiff in a tort action. Then another action was started to recover medical expenses under the policy's medical provision. It was held, since separate premiums were paid for liability coverage and medical payments coverage and since each coverage was separate, the medical payments coverage was a separate contract (although contained in one policy), and the insurer had no defense he had satisfied a judgment under the liability coverage. See, also, Distefano v. Delta Fire & Casualty Company, La.App., 98 So.2d 310; Barbour v. State Farm Mutual Automobile Insurance Co., D.C. Mun.App., 141 A.2d 924, 925, note 2; 8 Appleman, Insurance Law & Practice, § 4896 (Supp.); 42 A.L.R.2d 983; Hawayek v. Simmons, La.App., 91 So.2d 49, 61 A.L.R.2d 1254. Two recent statements [1960] by courts are:

"[T]he trial court properly allowed recovery of this amount as damages within the tort recovery, since (in the absence of a policy clause clearly excluding such liability) the tortfeasor's insurer is not entitled to credit against a recovery in tort for amounts received by the injured person paid to him pursuant to the insurer's contractual liability for medical expenses under a separate insuring agreement for which a premium is also charged."[135]

And, again:

"The trial judge found that Mr. Dumas had established medical expenses amounting to $2,146.99, and

---

133. For allowance of such loss, see, Yonner v. Adams, Del.Super., 167 A.2d 717, where complete discussion occurs on either a husband or wife cause of action for loss of consortium where injuries were allegedly due to defendant's negligence.

134. General Motors Corporation v. Freeman, Del., 164 A.2d 686; Kane v. Reed et al., 9 Terry 266, 48 Del. 266, 101 A.2d 800; Sentilles v. Inter-Caribbean Shipping Corp., 361 U.S. 107, 80 S.Ct. 173, 4 L.Ed.2d 25.

135. Borddon v. Great American Indemnity Co. et al., La.App., 124 So.2d 634, 639.

rendered judgment on this item for that amount. The policy sued upon provided for medical payments up to $2,000 for each person who suffered injury in the insured automobile. During the trial it was stipulated and agreed that defendant had, prior to trial, paid out the full amount of $2,000 toward the medical expenses of Mr. Dumas. The defendant contends that the trial court erroneously refused to give the defendant credit for the $2,000 previously paid, thus allowing the recovery of the medical expenses twice. Defendant argues that the recovery for medical expenses should be limited to the sum of $146.99.

\* \* \* \* \* \*

"[W]e, therefore, find that defendant is not entitled to a credit of $2,-000 for the amount which it paid under the medical payments clause." [136]

The most recent case is Long v. Landy, 1961, 35 N.J. 44, 171 A.2d 1, at page 7, which, in following the collateral source doctrine said: "[A] tortfeasor may not set up in mitigation of damages payments made to injured persons from collateral sources (cases cited)." [137]

Under this view, plaintiff Howard Truitt is entitled to recover in the case at bar the medical expenses incurred on behalf of his son, James Walter Truitt, and his wife, Pearl L. Truitt, regardless of any payment made by defendant's insurer under a separate and divisible medical payments contract.

*Conclusions.* 1. This Court has jurisdiction of the cause,[138] Erie applies, and the action is not barred by the Delaware Guest Statute.[139]

2. Defendant owed to plaintiffs mother and son the duty: (1) Not to drive at a greater speed than reasonable under the conditions, having regard to the actual hazards then existing;[140] (2) to drive at an appropriate speed when special hazards existed of weather and highway conditions;[141] (3) to drive upon the right half of the highway;[142] not to drive to the left side of the center line of the road in overtaking and passing the truck proceeding in the same direction when the left side was not clearly visible;[143] and, in general, the duty constantly to keep and maintain a proper lookout and to have his car under proper control at all times.

3. The preponderance of the evidence establishes negligence and breach of duties, and such negligence was the proximate cause of the damages sustained by plaintiffs.

136. Dumas v. United States Fidelity and Guaranty Co., La.App., 125 So.2d 12, 20–21.

137. The Supreme Court of New Jersey wrote (171 A.2d at page 7):
"[W]e see no reason to deviate from the general rule insofar as the payments for medical and hospital expenses are concerned merely because the husband paid the premiums. This does not affect the common law rule that a tortfeasor may not benefit by payments to the injured party from collateral sources. Plaintiff was the direct contractual beneficiary of these policies which vested her with a property right. Cf. Metropolitan Life Insurance Co. v. Dinzik, 141 N.J. Eq. 336, 57 A.2d 247 (Ch.1948). Furthermore, the payment of the death benefits arising from the husband's decease, the vesting of the jointly owned stock in plaintiff upon the death of the husband, and the inheritance through the estate of the husband, cannot be considered compensation for the injuries inflicted upon plaintiff through the wrongful act of her husband. The contractual right is separate and distinct from any right she may have to recovery for the *quantum* of damages sustained by her from the independent tortious act of her husband. The two should not be confused. No rule of law or equity comes to mind which would permit such an offset as the administrator seeks. The court did not err either in its refusal to charge as requested or in its refusal to grant the administrator's motion for an offset."

138. 28 U.S.C. § 1332.

139. 21 Del.Code § 6101(a).

140. Pursuant to 21 Del.Code § 4125(a).

141. Ibid. § 4125(b).

142. Ibid. § 4130(a).

143. Ibid. § 4133(c).

4. Plaintiff Howard Truitt may recover medical expenses.[144]

*Verdicts.* Plaintiff James Walter Truitt has judgment against defendant for $7,500.

Plaintiff Pearl L. Truitt has judgment against defendant for $30,000.

Plaintiff Howard Truitt has judgment, including medical expenses, against defendant for $3,750.

144. Notwithstanding the previous payment to this plaintiff by defendant's insurer of $1000 under the medical coverage provisions of defendant's policy.