## DRESNER ET AL. *v.* CITY OF TALLAHASSEE.

No. 35. Argued October 23, 1963.—Questions certified to Supreme Court of Florida December 2, 1963.

*Howard Dixon* and *Carl Rachlin* argued the cause for petitioners. With them on the briefs were *Alfred I. Hopkins* and *Tobias Simon.*

*Edward J. Hill* and *Roy T. Rhodes* argued the cause for respondent. With them on the brief was *Rivers Buford, Jr.*

PER CURIAM.

Considering that there are questions of Florida law answers to which are necessary to enable this Court to determine its jurisdiction over this cause, and with respect to which there appear to be no precise controlling precedents in the decisions of the Supreme Court of Florida, this Court desires to certify to the Supreme Court of Florida, pursuant to Rule 4.61 of the Florida Appellate Rules, the questions stated hereafter.

The petitioners have been tried and convicted in the Municipal Court of Tallahassee for unlawful assembly, under a municipal ordinance which incorporates by refer-

ence the state unlawful assembly statute.[1] The convictions were affirmed in the Circuit Court of the Second Judicial District, Leon County, Florida.[2] The unre-

---

[1] Section 23–38 of the Tallahassee Code, which provides that it shall be unlawful for any person to commit an act which is or shall be recognized by the laws of the State as a misdemeanor.

Chapter 61–237, Laws of 1961, Florida Statutes § 870.04 provides:

"If any number of persons, whether armed or not, are unlawfully, riotously or tumultuously assembled in any county, city or municipality, the sheriff or his deputies, or any constable or justice of the peace of the county, or the mayor, or any commissioner, councilman, alderman or police officer of the said city or municipality, or any officer or member of the florida [sic] highway patrol, shall go among the persons so assembled, or as near to them as may be with safety, and shall in the name of the state command all the persons so assembled immediately and peaceably to disperse; and if such persons do not thereupon immediately and peaceably disperse, said officers shall command the assistance of all persons in seizing, arresting and securing such persons in custody; and if any person present being so commanded to aid and assist in seizing and securing such rioter or persons so unlawfully assembled, or in suppressing such riot or unlawful assembly, refuses or neglects to obey such command, or, when required by such officers to depart from the place, refuses and neglects to do so, he shall be deemed one of the rioters or persons unlawfully assembled, and may be prosecuted and punished accordingly."

The State refers in its brief to a Tallahassee ordinance specifically prohibiting unlawful assembly, which is also included in the record by stipulation of the parties. This ordinance is similar in substance to the state statute quoted above. However, all parties seemingly have proceeded on the premise that the petitioners were charged and convicted only under the general ordinance which incorporated the state statute. The Circuit Court plainly decided the case on that basis. See Appendix, *post,* p. 139.

[2] The petitioners appealed their convictions directly to the Supreme Court of Florida. The Supreme Court ruled that it lacked jurisdiction and ordered the appeal transferred to the Circuit Court. 134 So. 2d 228.

After the convictions were affirmed in the Circuit Court and prior to the filing of a petition for certiorari in this Court, the petitioners attempted to file, and subsequently withdrew, a petition for certiorari in the District Court of Appeal.

ported opinion of that court, a copy of which, taken from the record, is attached to this certificate as an Appendix, contains a statement of the facts on which the convictions rested. The petitioners sought certiorari in this Court, which the City of Tallahassee opposed on the ground, *inter alia,* that the judgment of the Circuit Court was not "rendered by the highest court of a State in which a decision could be had," as required by 28 U. S. C. § 1257. This Court granted certiorari, 372 U. S. 963, and subsequently directed counsel to file briefs on the jurisdictional issue, which counsel have done.

The questions which this Court desires to certify are:

1. On a timely petition for writ of certiorari or other process, does the Florida District Court of Appeal or any other court of Florida have jurisdiction to review a judgment of the Circuit Court affirming a conviction in the Municipal Court of a violation of a municipal ordinance which incorporates a state statute by reference, where the questions presented for review concern the federal constitutionality of the ordinance on its face and as applied?

2. If the District Court of Appeal or any other court of Florida does have such jurisdiction and had granted review in this case by way of a writ of certiorari or other process, would it have been empowered to consider fully each of the following contentions, all indisputably properly preserved:

(a) "Petitioners were peaceable and orderly at all times; hence, there was no evidence whatsoever to support the convictions below for unlawful assembly, and therefore Petitioners have been denied due process of law under the Fourteenth Amendment";

(b) "The convictions constituted a violation of Petitioners' rights of freedom of speech and freedom of assembly as guaranteed by the Fourteenth Amendment";

(c) "The arrests and convictions herein constituted an undue burden on interstate commerce in violation of the interstate commerce clause of the Federal Constitution";

(d) "The arrests and convictions herein constituted a denial of the equal protection of the laws guaranteed by the Fourteenth Amendment"?

If not, in what respects would the scope of review have been limited?

The Clerk of this Court is directed to transmit this certificate, signed by THE CHIEF JUSTICE and under the official seal of the Court, to the Supreme Court of Florida, and simultaneously to transmit copies thereof to the attorneys for the respective parties.

## APPENDIX.

### OPINION OF THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT, LEON COUNTY, FLORIDA.*

*Order Affirming Judgments.*

This is an appeal from convictions in the Municipal Court of the City of Tallahassee, Florida of the ten appellants named in the caption who were charged with unlawful assembly. A fine was assessed against each of them with an alternate jail sentence.

The formal charge is in a single count naming the ten appellants and three others [1] as defendants and alleges an unlawful assembly on June 16, 1961 "in that, they being more than three (3) persons, met together to commit a breach of the peace, acting together and concertedly to occupy and continuously occupy certain chairs and

---

*Entered August 16, 1962. (Footnote supplied.)

[1] Of these three one was acquitted and the other two were granted a nolle prosequi. (Original footnotes renumbered.)

seating facilities in the Tallahassee Municipal Airport, making and cancelling group airline reservations on the two (2) operating airline schedules departing Tallahassee on said date, and on June 15, 1961, and meeting together in concert attendant with circumstances calculated to excite alarm, endanger the public peace and excite fear, and in such nature as to inspire well-grounded fear in persons of reasonable courage, of riot, or other breaches of public peace, and while so unlawfully assembled" were commanded by a police officer of the city, after identifying himself as such, to immediately and peaceably disperse, and they refused or neglected to do so.

The appellants contend that the judgments pursuant to convictions violate their rights guaranteed by the Florida and United States Constitutions in that they have been denied the equal protection of the laws and have been deprived of liberty or property without due process of law. They contend that the state statute, Chap. 61–237, Laws of 1961, (F. S. 870.04), (which, by reference adoption in a municipal ordinance,[2] is made an ordinance of the City of Tallahassee) is unconstitutional and void, either on its face or as it has been applied to the appellants in this case.

The pertinent portions of the statute, adopted as an ordinance, are:

> "If any number of persons . . . are unlawfully, riotously or tumultuously assembled in any . . . city or municipality . . . any . . . police officer of said city or municipality . . . shall go among the persons so assembled . . . and shall, in the name of the state command all the persons so assembled immediately

---

[2] Sec. 23–38, Tallahassee Code, provides that it shall be unlawful for any person to commit any act which is or shall be recognized by the laws of the state as a misdemeanor. The penalty is a maximum fine of $500.00 or 60 days imprisonment or both.

and peaceably to disperse; and if such persons do not thereupon immediately and peaceably disperse, said [officer] shall command the assistance of all persons in seizing, arresting and securing such persons in custody; and if any person present . . . when required by such [officer] to depart from the place, refuses or neglects to do so, he shall be deemed one of . . . the persons unlawfully assembled and may be prosecuted and punished accordingly."

The facts in the case are not in dispute and squarely present the question as to whether or not the conduct of the appellants was an exercise by them of rights they hold under state and federal constitutional provisions, which would preclude their prosecution, conviction and sentence for unlawful assembly in the trial court.

The appellants are clergymen, two being rabbis and the others being ordained ministers of several Protestant denominations. They are residents of New Jersey, New York, Massachusetts or Connecticut. Some of them are of the white race and some are negroes. About June 12 or 13, 1961 they, together with eight other clergymen from the same general area, departed from Washington, D. C. by interstate common carrier bus for a so-called "Freedom Ride" into Virginia, the Carolinas, Georgia, and Florida. The bus ride terminated in Tallahassee June 15, 1961. The "Freedom Riders" left their buses at the Greyhound bus terminal there and went into the terminal lunch room to obtain food which was served them.

This trip was sponsored and at least partially financed by an organization known as C O R E (Congress on Racial Equality) which has been aggressive in promoting racial integration and desegregation. The trip was well publicized, having been given wide coverage in all news media including radio and television. The time

142

and place of arrival in Tallahassee was heralded and well known.

The purposes of the "Freedom Ride", as stated by appellant Collier, who was the spokesman for the group, were two-fold: (1) To ascertain whether or not there were facilities available on an integrated basis to interstate passengers in waiting rooms, in rest rooms, in eating facilities in the terminals through which they would pass; and (2) To bear witness as ministers, rabbis and clergymen to the struggle to obtain those rights "guaranteed us by the Constitution."

Shortly prior to the time the buses bearing the "Freedom Riders" were scheduled to arrive at about noon on June 15, there had gathered in the vicinity of the bus station a number of persons and groups of persons. Law enforcement officers, including city police, had been dispatched to the area to prevent any disturbance. It was suspected that resentment against the "Freedom Riders" might result in some attempts at violence toward them or precipitate other disorders. When the buses arrived, law enforcement personnel moved in and gave protection to the passengers as they left the bus and entered the lunch room in the terminal. Apparently they were served in the lunch room under circumstances and policies satisfactory to them.

In approximately an hour after arrival at the bus terminal the eighteen "Freedom Riders" proceeded to the Tallahassee Municipal Airport ostensibly for the purpose of boarding a 3:25 P. M. Eastern Air Lines plane for passage to Washington, Newark, or New York. They were transported to the airport in private cars presumably furnished by local sympathizers with their objectives.

Upon arrival at the airport they found that the restaurant there had been closed. When the time approached for arrival of the 3:25 plane the ten appellants cancelled the reservation they had previously made for

the flight. The other eight boarded the plane when it arrived and departed for their destinations in the East.

At that time, the airport arrangement provided separate waiting rooms, or areas, for white and negro; also separate rest rooms; and separate areas for serving food, the white area being a glassed-in place and the negro consisting of a counter with several stools. However, as mentioned before, the eating service had been discontinued by the closing of the restaurant facilities. A sandwich vending machine was in the lobby, but the prices on same had been marked up from previous prices.

The appellants stayed together in a more or less compact group in the lobby area most of the time and no attempt was made to enforce separation of the races in the waiting room. Rest rooms were used by them without observing the designation of the segregated facilities.

After cancelling their reservations for the 3:25 P. M. flight they sought and ultimately obtained reservations for a flight the next morning at 8:25 on an E. A. L. plane. They remained in the airport until about 11:00 P. M. that evening for the purpose of observing if the restaurant would open and service be granted to them. The restaurant remained closed.

Law enforcement officers, including city police, were detailed to keep order. The activities and objectives of the appellants had been the subject of news reporting and groups of people were seen to be gathering or attempting to gather in the vicinity of the airport. There were critical and hostile comments made about the appellants. The police turned away some of those gathering when it was apparent such persons had no airport business or interest. Persons were even screened at the entrance and turned away by officers if they had no business to transact at the airport.

The chief of police advised the appellants that the airport terminal would close for the night at approximately

11:45 P. M. and a spokesman for appellants requested protection as they moved from the airport into the city and also on the return to the airport the next morning. Such protection by escort of law enforcement officers was provided.

The appellants thus left the airport at about 11:00 P. M. on the 15th to return the next morning prior to the scheduled departure at 8:25 A. M. of the plane on which they had obtained reservations. They were given escort security protection on both the occasions of leaving and returning to the terminal.

The restaurant was also closed on the morning of June 16. At 8:15 A. M. all ten of the appellants cancelled their reservations for the 8:25 flight and remained in the waiting room after that flight had departed. At 8:20 A. M. they sought, and ultimately obtained, reservations on a National Airlines flight scheduled to depart at 1:47 P. M. that day, but cancelled just prior to noon.

During these periods there continued to be movements and gatherings of groups of people in cars and there was a hostility and open resentment against the conduct and attitudes of the appellants. A considerable number of police, sheriff's deputies and highway patrolmen had been detailed to prevent disorder. City, county and state officials, including the Governor, were apprehensive and moved to provide necessary law enforcement personnel to preserve order.

At about 12:15 P. M., Mr. James Messer, Jr., city attorney of Tallahassee and a special police officer of the city, after conferring with the mayor and chief of police of the city, approached the appellants who were together and inquired if there was a leader of the group. Appellant Collier arose and identified himself and assumed to act as spokesman. Mr. Messer identified himself and his official positions, exhibiting his police badge. Others in the group gathered around Mr. Messer and Rev. Collier

and Mr. Messer read to them a proclamation. He stated that the assembly of the appellants at the Municipal Airport of Tallahassee will tend to create a disturbance or incite a riot or disorderly conduct within the City of Tallahassee at its Municipal Airport over which the city had jurisdiction. He mentioned incidents of the previous night and fears of more unrest. He then commanded them in the name of the state and city to immediately and peaceably disperse, and explained that such meant from the airport property. He then added that failure to so disperse would result in arrest for unlawful assembly. Collier asserted that they were interstate passengers, to which Messer replied that he did not consider them to be bona fide passengers in view of their reservation cancellations.

Several local sympathizers with the appellants dispersed, but appellants failed to do so. After about 1½ minutes, Mr. Messer turned to the Chief of Police and remarked "Chief, you can carry out your orders." The appellants were arrested and taken into custody.

The appellants take the view that the segregation practices with regard to waiting rooms, rest room facilities, and restaurant or eating facilities at the airport were violative of constitutional guarantees of equal protection of the law. They would also inject into the case the installation of sandwich and cigarette machines, at or just prior to their arrival, which inflated the prices of merchandise vended to double what it had been. The closing of the restaurant on the day of their arrival and its opening shortly after their departure is viewed as an important factor.

These facts are, in the view of this Court, not at all significant in the legal problems involved in the charge against the appellants and the disposition of such charge by the trial court.

The municipality of Tallahassee operates in a proprietary capacity and in a governmental capacity. Among its proprietary functions is the ownership and operation of a municipal airport and supervision over the concessions there. Assuming, but not deciding, that its policies of segregation of the races in its facilities are unlawful and did constitute a violation of some duty to the appellants if enforced against them, and further assuming, without deciding, that the closing of the restaurant under the circumstances violated some duty to them, do such circumstances justify a concerted protest demonstration by appellants of their views and convictions over a protracted period of time during which tensions and tempers rise in the community which threaten to erupt into disorder and thus render the city, in its governmental capacity, powerless to terminate the demonstration in the exercise of its police power?

Stated another way, may not a lawful assembly for the purpose of protesting and demonstrating opposition to a course of policy practiced by the municipality become an unlawful assembly when pursued to unreasonable lengths imposing unreasonable burdens on others, after the lawful objectives of the demonstration had been fairly accomplished?

It is fundamental that our constitutions accord to the citizen of the United States the right of freedom of speech and of assembly and to peaceably petition for a redress of grievances. Such freedoms are jealously guarded and when exercised in good faith and in good order may not be lawfully interfered with by governmental action. However, it is not a license to take into one's own hands the enforcement of law or by excessive harassment, effect coercion and acceptance of one's convictions and interpretations of legal rights by governmental entities whose policies are in conflict. Such procedures wholly ignore the very machinery provided by the

constitutions and laws of the nation and state for the declaring, securing and enforcement of constitutional and other legal rights. It is the courts, both state and federal, to whom resort is readily available for citizens to seek recognition and enforcement of legal rights and immunities. That such courts may not move as swiftly as the individual would wish does not authorize pursuit of personal means which unnecessarily create or threaten public disturbance or disorder, or which substantially interfere with normal, orderly functions of a public facility.

Such a procedure is a form of anarchy which, if it becomes an accepted practice, can have only the effect of seriously weakening orderly government.

The appellants, prior to the reading of the riot act to them, had achieved their announced objectives. They had observed both at the bus station and the airport the integration or lack of it of the waiting room, rest room and restaurant facilities. They had very effectively borne witness as clergymen and otherwise of their sympathy with the struggle to obtain desegregation of the various facilities of interstate travel.

To accommodate and facilitate those legitimate objectives the law enforcement agencies of city, county and state had given protection against potential violence or other disorder from groups or individuals who resented the activities of the appellants. This protection was afforded at the bus station, at the airport on the afternoon of June 15, on the evening of June 15 when the appellants left the airport to come into town and on the following morning when they returned to the airport purportedly to take an early plane. However, instead of using the reservations they had obtained they made a cancellation. This was thrice they had made last minute cancellations of reservations for the sole reason that they wished to eat in the restaurant, which was closed. In the meantime their conduct and persistence was arousing increased re-

sentment and anger in the community with threats of violence and disorder toward the appellants.

Obviously, the conduct of appellants had revealed a pattern. They would make reservations for travel, wait in the lobby until just before the plane they were scheduled to take arrived and then cancel, make reservations on a later flight and then again cancel at the last minute, at all times remaining in the airport but never taking a plane. The effect is obvious. The seats and other facilities are occupied by them and their use denied to those who actually wished to travel. The use of rest rooms and wash rooms by them partakes more of lodging than a comfort feature for those whose sole purpose is some airport business. The reservation of space and last minute cancellations prevented the use of that space of the flights involved, resulting in loss and inconvenience to the air line involved and probable denial to other would-be travelers of the use of that space. The sole purpose of such a course of harassment was to goad the municipality and its restaurant lessee to open the restaurant and gratify the appellants' wishes that they be served in the style and manner they deemed to be their right.

Controversies between citizens and governmental units are not unique. In nearly every instance there is a conflict in what the citizen contends he has a right to claim and the governmental entity which would deny the validity of such claim. The citizen may freely express his views and seek to cultivate converts to them with a view of bringing moral or political pressures on the officers of the public body to accord his demands. However, such means must be exercised in a manner that is reasonable and not harmful to the rights of others or the peace and good order of the community. Especially is this true when the controversy is one of public interest in which there are strong and emotional feelings on the part of a substantial number of persons in the community.

The courts, both state and federal, are open to resolve controversies on constitutional issues in duly instituted and processed civil actions. Indeed, the very issue in the demonstrations of the appellants was subsequently presented to and adjudicated by the United States District Court for the Northern District of Florida. Brooks, et al. v. Tallahassee, 202 Fed. Supp. 56. When citizens press their demonstrations in behalf of a cause (however worthy they deem their objectives to be) beyond the bounds of fully and effectively delivering their message and reach the stage that they materially and harmfully interfere with the orderly business and lawful activities of others, who are acting in public or private capacities, then the conduct is disorderly and assembly for carrying it out is unlawful. Such was the case here.

The judgments appealed from are hereby affirmed.
Affirmed.

Ben C. Willis, Circuit Judge