**W. S. RANCH COMPANY, a New Mexico Corporation, Appellant,**

v.

**KAISER STEEL CORPORATION, a Nevada Corporation, Appellee.**

No. 9295.

United States Court of Appeals Tenth Circuit.

Oct. 12, 1967.

Rehearing Denied Feb. 1, 1968.

A. K. Montgomery and Seth D. Montgomery, Santa Fe, N. M. (George W. Robertson, G. Gordon Robertson, Raton, N. M., and Richard S. Morris, Santa Fe, N. M., with them on brief), for appellant.

Paul A. Kastler, Raton, N. M., and George T. Harris, Jr., Albuquerque, N. M., for appellee.

Before MURRAH, Chief Judge, and BROWN* and HICKEY, Circuit Judges.

MURRAH, Chief Judge.

This is an appeal from judgment of dismissal for failure to state a claim on which relief can be granted. The two-fold question, presented and decided on the pleadings, is whether the New Mexico statutes grant the right of eminent domain to a private corporation for the purpose of securing water to be used in coal mining operations, and, if so, whether inverse condemnation proceedings is the sole remedy available to one whose land is so taken.

Plaintiff-appellant W. S. Ranch Company filed its Complaint in the District Court of New Mexico alleging that it is the owner and possessor of certain land on and near the Vermejo River in New Mexico; that defendant-appellee Kaiser Steel Corporation wilfully and maliciously entered upon Ranch's lands, after notice that its right to enter was disputed, drilled diversion wells and laid a pipeline to divert water from the Vermejo River to its coal mining operations adjacent to Ranch's property; and that Ranch is entitled to an injunction against further trespass and compensatory and punitive damages. Claiming the right of eminent domain, Kaiser responded with a Motion to Dismiss the Complaint supported by an affidavit to the effect that Kaiser owns water rights approved by the New Mexico State Engineer to be used for "beneficial use" at its coal mine; that an approved place of diversion for such waters is on the Vermejo River and that the beneficial use of such waters necessitates conveying them by pipeline across Ranch's lands. Nowhere does Kaiser contend that it negotiated with Ranch for a right-of-way or that it instituted condemnation proceedings as prescribed by Sec. 22–9–1 through 22–9–21 N.M.Stat. Anno.

Kaiser claims its right to eminent domain under the following constitutional and statutory provisions:

*Art. XVI, § 2 N.M.Const.*

"The unappropriated water of every natural stream, perennial or torrential, within the state of New Mexico, is hereby declared to belong to the public and to be subject to appropriation for beneficial use, in accordance with the laws of the state. Priority of appropriation shall give the better right."

*Art. XVI, § 3 N.M.Const.*

"Beneficial use shall be the basis, the measure and the limit of the right to use water."

*§ 75–1–3, N.M.Stat.Anno., 1953 Comp.*
" * * * any person, firm * * * or corporation, may exercise the right of eminent domain, to take and acquire land right-of-way for the construction, maintenance and operation of * * * pipe lines or other works for the storage or conveyance of water for beneficial uses."

On Motion to Dismiss and here the Ranch Company argues that if, as Kaiser contends, § 75–1–3 is construed to authorize the condemnation of private land to secure water in aid of mining operations, it must be declared unconstitutional as permitting the taking of private land for private use; that the statute can be accorded constitutional validity only if the "beneficial use" of water for which it authorizes eminent domain is determined by the ultimate or final use of the water, and that use inures to the benefit of the public—not private industry. The effect of this argument is to suggest that even though the constitutional words "beneficial use" may be construed to mean any use whatsoever except waste, when that term involves the exercise of the power of eminent domain, it must necessarily be measured by "ultimate use" and limited to "public use".

Relying upon a number of New Mexico Supreme Court cases, Judge Bratton held that in an arid state such as New

---

* By Special Designation.

Mexico any "beneficial use" of water is a "public use", i. e. see Albuquerque Land and Irrigation Company v. Gutierrez, 10 N.M. 177, 61 P. 357; City of Albuquerque v. Garcia, 17 N.M. 445, 130 P. 118; Pueblo of Isleta v. Tondre, 18 N.M. 388, 137 P. 86; Young v. Dugger, 23 N.M. 613, 170 P. 61; State ex rel. Red River Valley Co. v. District Court of Fourth Judicial District, 39 N.M. 523, 51 P.2d 239; State ex rel. State Game Commission v. Red River Valley Co., 51 N.M. 207, 182 P.2d 421; Threlkeld v. Third Judicial District Court, 36 N.M. 350, 15 P.2d 671, 86 A.L.R. 547. He agreed with Ranch that in each of the cited cases the New Mexico court was concerned only with the ultimate use of water for irrigation and other domestic purposes, concededly a "public purpose" in New Mexico. But, he thought it decisive that "the statute [75–1–3] places no such limit on the use of water, nor have the courts." He further reasoned that "While the grant of eminent domain may be exercised either by the State * * * or by private persons and industry * * * the public use which is being furthered is the *distribution* of the public waters of the state without which an arid state cannot develop"—not the *ultimate* use to which the water may be put after distribution. (Emphasis ours).

█ Undoubtedly, the decision in this case must necessarily have a far reaching effect. If the "beneficial use" of water is to be determined by the *distribution of water* among the people of New Mexico, as indeed the trial court held, then the "public benefit" must be rationalized in light of the well established fundamentals of eminent domain, for land will become subject to condemnation for purposes of diverting water to anyone whomsoever for any ultimate purpose whatsoever, public or private, save, of course, waste. On the other hand, if the "beneficial use" is to be determined by the *ultimate use* to which the water is put, then even though an individual or industry may secure a valid right to take water from the public sources, there can be no assurance of any means of diverting the water from

its source to the place of use, and industry and growth of the state could be severely hampered. It is conceded that this precise question of industrial use of public waters has never been presented to the New Mexico courts. We must seek then to determine what that court will say when the question comes before it and to reconcile the law of eminent domain with the peculiar body of water law developed from necessity in arid states.

Both Ranch and Kaiser rely upon the same New Mexico cases as did the trial court, each contending for a different interpretation. The case law is not decisive, but as we read the cases, the court in each instance scrutinized the specific or "ultimate" use to be made of the public water. An analysis of the crucial language in each case will illuminate our conclusion.

In 1900, prior to the enactment of 75–1–3, the New Mexico courts were already facing the question of condemnation of private land for purposes of diverting water from a public source to non-riparian lands. The court in Albuquerque Land and Irrigation Co. v. Gutierrez, supra, affirmed "that the legislature has power to enact a law granting the right of eminent domain * * * provided the property taken is for a *public purpose*" and "It is undoubtedly true that the diversion and distribution of water for *irrigation and other domestic purposes* in New Mexico, and other western States where irrigation is necessary, is a *public purpose.*" Id. 61 P. 357 (Emphasis ours). Section 75–1–3 was enacted in 1907 and in 1913 the court first construed the statute stating, "[T]he right *to condemn* lands *for irrigation ditches* was conferred upon 'the United States, the [State] of New Mexico, or any person, firm, association or corporation.'" See City of Albuquerque v. Garcia, supra. The court evidenced its concern for the constitutional question by citing and quoting the Utah case of Nash v. Clark, 27 Utah 158, 75 P. 371, 1 L.R.A.,N.S., 208, affd. 198 U.S. 361, 25 S.Ct. 676, 49 L.Ed. 1085, to the effect that "In view of the physical and climatic conditions * * * and in light of the history of the arid West, which

shows marvelous results accomplished by irrigation, to hold that the *use of water for irrigation* is not in any sense a public use * * * would give to the term 'public use' altogether too strict and narrow an interpretation, and one we do not think is contemplated by the Constitution." (Emphasis ours)

Shortly thereafter in Pueblo of Isleta v. Tondre, supra, the New Mexico court held that the terms of 75–1–3 were broad enough to confer the right of condemnation for the *particular purpose of irrigation* upon persons holding valid water rights prior to enactment of the statute. The later case of Young v. Dugger, supra, presented again the sole question "whether the right of condemnation exists in favor of private persons *for the purpose* of conveying water for *irrigation purposes* over the land of another." Id. 170 P. 61 (Emphasis ours). Relying on its previous decision in City of Albuquerque v. Garcia, supra, the court once more held that "use of water for irrigation purposes constitutes a public use."

In State ex rel. Red River Valley Co. v. District Court of Fourth Judicial District, supra, the State of New Mexico sought to condemn private land for the purpose of erecting a dam or reservoir for impounding the waters of the Canadian River. The court held that "The state may appropriate private property under its inherent power of eminent domain by legislative act * * *. Whether the *use to which the property is to be put* is a public use is a judicial question * * *. But the *character of u*se here involved [irrigation] was long ago determined by the Supreme Court of the Territory to be a public use and never departed from by this court * * *".

Next came State ex rel. State Game Commission v. Red River Valley Company, supra. The New Mexico court was concerned first with whether certain impounded waters were public waters and, if so, whether their use for recreational purposes would be a "beneficial use". The court noted that "The invitation to enjoy these recreational activities is urgently and constantly extended

by this and other states similarly situated, and millions of dollars are spent by tourists from less attractive areas who come to enjoy them." It went on to say that "We are asked to strike down the long established rules pertaining to public water ownership and uses because we have not yet been called upon to apply it to this *particular beneficial use.* * * * We know of no reason why we should restrict the use of waters which belong to the public only to *the uses* which have, *up to this time* been adjudicated by our court as 'beneficial'." (Emphasis ours)

The water right cases were invoked in Threlkeld v. Third Judicial Dist. Court, 36 N.M. 350, 15 P.2d 671, 86 A.L. R. 547, in support of the asserted power of eminent domain under a statute authorizing a logging company to take private property for right-of-way purposes in accordance with the laws governing common carriers. Denying the right of eminent domain, the court went to the heart of the matter with the inquiry as to what ultimate use would be made of the right-of-way. Finding that the right-of-way was to be used in furtherance of logging operations, it concluded that such operations did not fit into the distinctive classification accorded uses of water for irrigation purposes, historically recognized as a public purpose out of "elemental necessity". Likening water to air which "must not be allowed to fall under private control", the court went on to use the language which Judge Bratton deemed significant and supportive to the effect that "Only by invoking the power of eminent domain can a state distribute its own waters as its public policy requires. A right of way taken for that purpose is in a large sense devoted to public use."

■■■ We are reluctant to disagree with a New Mexico trial judge interpreting New Mexico law, but nowhere in the cases examined can we find language to support the trial court's ruling that "the public use being furthered is the distribution of the waters * * *". On the contrary, our appraisal of the language in each case leaves us with the inescapable

impression that the court was looking to the ultimate use of the water to determine whether that use would inure to the benefit of the general public or only a few individuals. This is apparent in the Red River Valley case where the New Mexico court considered the general economic benefit to inure to the people of New Mexico from the particular use of its waters for recreational purposes. We think the language in that case leaves no doubt that the court deemed itself impelled to examine each proposed ultimate use of the public waters and determine whether that use was of sufficient public benefit as to justify eminent domain. This "ultimate use" concept is also manifest in the United States Supreme Court's affirmance of Nash v. Clark, supra, wherein it acknowledged that many factors have bearing upon "the question whether *the individual use* proposed might not in fact be a *public one*." (Emphasis ours)

This brings us at last to our salient question whether the ultimate use of public waters in aid of coal mining is a "beneficial" or "public" use so as to confer upon Kaiser the power of eminent domain for a right-of-way to divert such water. We, of course, start with the proposition that private property can be taken only for public use and that the effect of the New Mexico decisional law is to carve out an exception to this constitutional mandate in recognition of overriding considerations born of necessity in an arid land where water is the life-blood of the community. Certainly the right of an individual to hold and enjoy property ought not be subjected to the carte blanche power of eminent domain simply because distribution of water may promote the public interest, and tend to develop the natural resources of the state." Clark v. Nash, supra. Each case must rest upon its own constitutional footing.

In some states "mining", like irrigation, is, to be sure, deemed to be pub-lic in character for the purposes of eminent domain. This is made so either by constitutional or statutory provision or court adjudication. See Inspiration Consol. Copper Co. v. New Keystone Copper Co., 16 Ariz. 257, 144 P. 277, and cases collected there. And, this in no way violates the Federal Constitution. See Clark v. Nash, supra. But, the determination of what shall constitute a "public" use is a judicial question. See State v. District Court of Fourth Judicial District, supra. The mere fact that some states permit the taking of private property in aid of. "mining" is not controlling here, for the New Mexico court in Gallup American Coal Co. v. Gallup Southwestern Coal Co., 39 N.M. 344, 47 P.2d 414, considering the precise industry of coal mining, rejected the public character of the industry with the observation that "As an essential or paramount industry, in its importance to the existence and functioning of the state and to the livelihood of the people, [coal mining] does not seem to us to belong in a class with * * * irrigation in * * * New Mexico * * *. We consider it rather in a class with the timber or lumbering industry which was involved in the Threlkeld case. * * * It follows that, in so far as the statute impliedly declares a public use in the business or industry of coal mining, it is violative of the N.M. Const. art. 2, § 20." We think that case is controlling here. The court in Gallup was, to be sure, concerned with a statute other than 75–1–3. But, logic dictates that the New Mexico court would not deny the power of eminent domain in aid of coal mining under one statute, and sustain it under the statute invoked here merely because it speaks in terms of "beneficial use" of water.[1]

We hold that Kaiser had no power to take Ranch's land by eminent domain and that the Complaint stated a claim upon which relief could be granted. In this view of the case the question of inverse condemnation becomes academic.

1. It is noteworthy that the particular type of taking is not disclosed in the Gallup opinion. For all we know the court might very well have been concerned with the taking of a right-of-way to divert water in aid of coal mining.

We will, however, comment to the extent that if Kaiser had followed the intricately detailed New Mexico statutory procedure for acquiring land by condemnation, the issues presented and decided here could have been litigated in an orderly manner in the courts of New Mexico where they belong.

The judgment is reversed and the case is remanded with directions to proceed in accordance with the views herein expressed.

Before MURRAH, Chief Judge, and BROWN * and HICKEY, Circuit Judges.

## On Petition for Rehearing

PER CURIAM:

The petition for rehearing is overruled. The motion to abstain pending determination of the declaratory action instituted by Appellee, Kaiser Steel Corporation on October 30, 1967, in the State District Court of Colfax County, New Mexico, is likewise denied.

JOHN R. BROWN, Circuit Judge (concurring and dissenting):

I concur with no reservations in the overruling of Kaiser's petition for rehearing. With like conviction I respectfully dissent from the denial of the motion to abstain pending State Court determination. This seeming contradiction perhaps deserves some elaboration.

First, on the correctness of the opinion constructed for the Court by the Chief Judge I have no misgivings. With the materials which we have—and which have been worked on, poured over, reworked, and reargued countless times in briefs, replys, rejoinders and motions— the conclusion reached certainly appears to be a permissible and probably the correct one. But that is not the equivalent of saying that the result announced here is what the Supreme Court of New Mexico would *now* declare. The *Erie*-lights are here dim, very dim. For all acknowledge that never before has the Supreme Court of New Mexico been invited to go down, find, locate, follow, or mark the path of the right of a private party to condemn private property over which to transport water to be used for mining purposes,[1] and if not dim, they shine both ways if not all ways.[2] But the Court is the first to recognize that although the controversy comes to us as an ordinary run of the mine private diversity suit, it is overcharged with the most fundamental of major public policies to New Mexico. Phrased with characteristic judicial understatement, the Court sounds this awareness at the outset of its analysis. "Undoubtedly," the Court states, "the decision in this case must necessarily have a far reaching effect."

The stakes are high and the consequences portentous. Water, that vital natural resource, cuts a big figure in the economy, the official outlook of the state, and the jurisprudence of New Mexico. At least so far as federal constitutional aspects are concerned, the choice to be made is that for New Mexico alone. With the sketchy materials at hand, how can we say that it is the end use, the "ultimate use," that must confer the public benefit? And, even if there is really a choice between the alternatives phrased by the Court—a thing which I most earnestly doubt since the same problem is inherent in any effort to state it in terms of alternative or exclusionary categories—how are we to say that New Mexico declares that the use of water for irrigation will be "beneficial" to the public whereas the use of it as an indispensable requirement for the operation of an industrial enterprise would not be? True it is that if—as the Court holds—the public use is confined

---

* Of the Fifth Circuit, sitting by designation.

1. Thus the Court states: "It is conceded that this precise question of industrial use of public waters has never been presented to the New Mexico courts." p. 259.

2. The opinion continues: "Both Ranch and Kaiser rely upon the same New Mexico cases * * *, each contending for a different interpretation. The case law is not decisive * * *." p. 259.

to the traditional one of irrigation in an arid country, there are less disturbing implications of a sociological, political, or economic nature. But Federal Judges—at least in these days—do not have the Keys to the Kingdom to determine for a sovereign state the internal domestic policies which it desires to follow.

In our modern complex economic structure, government—state and local—no longer confines its bounty to the traditional rural or agricultural objects. Nowadays there is open, frank recognition that business—yes, big business—is both legitimate, wholesome and very, very much desired. Thus we see state after state, city after city, operating within the limits of officially declared policy, seeking out industry beyond the borders of the state under aggressive programs of solicitation with the high hopes that some industrial enterprise can be persuaded to relocate within the pursuer's boundaries. The process in the typical legislative structure is something a good deal more complex than simple, high-pressure salesmanship. Invariably it turns on state-authorized benefits, tax remissions, rental inducements and the like. And what is important here is that any such state-supported, state-authorized benefits inevitably fall upon members of the public and the cost is borne by property subject to taxation.

If—and the if today doesn't seem to be very great—property can fairly be taxed equitably and ratably to finance such economic inducements to business and industrial enterprise then it seems to me that subjecting private property to the prospect of condemnation at the hands of a private party is but a variation in the form of that burden. And probably, there is no burden at all since the taking requires just compensation.

From the standpoint of the economy of a city, a county, an area, or the whole state of New Mexico, a huge industrial enterprise such as the coal mining operation here involved may well be thought by the state to transcend either the value of the use of the water for traditional agricultural purposes [3] or the unsettling impact of a legislative policy allowing private parties under limited circumstances to exercise eminent domain over private property to transport water for use in further private activity.

With the stakes so high, the guiding materials so equivocal, the choice so wide open and the consequences one way or the other so devastating, what does good judicial administration suggest ought to be done? One thing it suggests is that we ought not to be doctrinaire either expressly or silently. Thus, Meredith v. City of Winter Haven, 1943, 320 U.S. 228, 64 S.Ct. 7, 88 L.Ed. 9, is not, as so often supposed, an absolute that under every and all circumstances a federal court in a diversity case has to plow through without calling on the state tribunals for aid in the divination of serious and troublesome state problems. Too much has gone on—indeed too much water has gone over the dam—for any such reading to be compelled. Putting to one side *Thibodaux*,[4] in which

---

3. Ultimate "private" use is a shibboleth. For it is conceded that a New Mexico farmer or rancher having water rights can exercise eminent domain to permit transportation of such water over intervening lands owned by others even though when finally on his land the waters will be used in the irrigation of crops or the raising of livestock on which he hopes to, and undoubtedly will, reap great profits in the private enterprise of a farmer.

4. Louisiana Power & Light Co. v. City of Thibodaux, 1959, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058. There, reversing the Fifth Circuit, the Court stated: "Informed local courts may find meaning not discernible to the outsider. The consequence of allowing this to come to pass would be that this case would be the only case in which the Louisiana statute is construed as we would construe it, whereas the rights of all other litigants would be thereafter governed by a decision of the Supreme Court of Louisiana quite different from ours." Id. at 30, 79 S.Ct. at 1073, 3 L.Ed.2d at 1063.
See also Leiter Minerals, Inc. v. United States, 1957, 352 U.S. 220, 77 S.Ct. 287, 1 L.Ed.2d 267: "[W]e think it ad-

the Court of Appeals was reversed for failure to abstain for state court determination in a diversity case, the Supreme Court's repeated use of the Florida *Clay* type certification procedure demonstrates that the policy reflected in *Winter Haven* is not a road block. It is simply one of the factors to be assayed. Starting with *Clay*[5] the Supreme Court not less than three times has exploited fully the Florida procedure.[6]

To me the sound approach continues to be the one reflected in the unreversed action of the Court in *Delaney*.[7] And experience since that time continues to bear out the strong note sounded by the concurring opinion[8] that real injustice is done to litigants and, worse, more

damage is done to the states' jurisprudence and its policies by a headstrong, resolute, inflexible determination on the part of a federal court to barge ahead in a sort of ascetic, misguided *Winter Haven* impulse, than will likely result from the slight delay occasioned by invoking state adjudication of the controlling issues.[9] For the simple fact is that more and more,[10] more federal courts are being overruled by more state courts on local issues upon which such federal courts have undertaken to read the *Erie* signs in the quest of the *Winter Haven* grail.

Texas, for example, continues on its path of independence in a number of instances[11] not the least of which was

visable to have an interpretation, if possible, of the state statute by the only court that can interpret the statute with finality, the Louisiana Supreme Court. The Louisiana declaratory judgment procedure appears available to secure such an interpretation * * * and the United States may of course appear to urge its interpretation of the statute. Id. at 229, 77 S.Ct. at 293, 1 L.Ed.2d at 275.

5. Clay v. Sun Ins. Office, Ltd., 1960, 363 U.S. 207, 80 S.Ct. 1222, 4 L.Ed.2d 1170, on certification upon remand, Fla., 1961, 133 So.2d 735, on receipt of answers to certification, 5 Cir., 1963, 319 F.2d 505, rev'd, 1964, 377 U.S. 179, 84 S.Ct. 1197, 12 L.Ed.2d 229.

6. In addition to *Clay*, the other two cases are Aldrich v. Aldrich, 1963, 375 U.S. 249, 84 S.Ct. 305, 11 L.Ed.2d 304, and Dresner v. City of Tallahassee, 1963, 375 U.S. 136, 84 S.Ct. 235, 11 L.Ed.2d 208. Useful as *Clay* certification is to the Supreme Court and to the Fifth Circuit its use is reserved to important questions. Run-of-the-mine cases with little recurring public importance are routinely given the *Erie* treatment. See, e. g., Motor Vehicle Cas. Co. v. Atlantic Nat'l Ins. Co., 5 Cir., 1967, 374 F.2d 601; Greer v. Associated Indem. Corp., 5 Cir., 1967, 371 F.2d 29; Hamilton v. Maryland Cas. Co., 5 Cir., 1966, 368 F.2d 768.

7. United Services Life Ins. Co. v. Delaney, 5 Cir., 328 F.2d 483 (en banc), cert. denied, 1964, 377 U.S. 935, 84 S.Ct. 1335, 12 L.Ed.2d 298, on motion for rehearing en banc, 5 Cir., 358 F.2d 714, cert. denied, 1966, 385 U.S. 846, 87 S.Ct. 39, 17 L.Ed.2d 77.

8. See United Services Life Ins. Co. v. Delaney, supra, 328 F.2d at 485 (concurring opinion). The *Delaney* abstention procedure and the justification for it sought to be articulated by the concurring opinion have come in for some spirited criticism. See Agata, Delaney, Diversity, and Delay: Abstention or Abdication?, 4 Houston L.Rev. 422 (1966) (Special Fifth Circuit Issue).

9. Subsequent *Delaney* judicial events in neither the Texas State Courts nor the Fifth Circuit (traced in note 5, Aetna Life Ins. Co. v. Barnes, 5 Cir., 1966, 361 F.2d 685, 687) prove that when employed with a little enlightened resourcefulness on the part of either counsel, trial court, or appellate court the *Delaney* abstention is unworkable or administratively unsound. It is safe to say that no one on the Fifth Circuit, majority or dissenting, entertained for the briefest fraction of a possible division of a moment the idea that on recourse to the state courts after remand either counsel or the Texas courts would suppose that the single critical issue be excised for a sort of law-school academic inquiry in the declaratory judgment proceeding.

10. In the score sheet which follows (notes 11, 12, 13 and 14 infra), I do not repeat the cases documented in *Delaney*.

11. See, e. g., Felmont Oil Corp. v. Pan-American Pet. Corp., Tex.Civ.App., 1960, 334 S.W.2d 449, error ref'd n. r. e., which expressly refuses to follow Sinclair Oil & Gas Co. v. Masterson, 5 Cir., 1959, 271 F.2d 310; see E. Brown, Law of Oil & Gas Leases, 1958: 1966 Cumulative Supplement, p. 293; Weymouth v. Colorado Interstate Gas Co., 5 Cir., 1966, 367 F.2d 84, 102 n. 57.

the Fifth Circuit's *Delaney* prediction itself.[12] But, this is not an infirmity of the Fifth Circuit alone.[13] And the experience in Florida demonstrates that state court reversals of Federal appellate decisions occur both in appeals of state cases [14] and on *Clay* certification (see note 5 supra) to the Supreme Court of Florida, the latter with some spectacular results.[15] For that matter, this Court has seen and felt first hand the independence of one of its states over the strong protest that for a uniform oil lease clause in a routine contract dispute its declarations for Kansas would simply have to do for Oklahoma as well.[16]

Of course, having concurred in the opinion and in the denial of rehearing, I necessarily embrace without reserva-

12. Prof. Agata points this out. "Additionally and ironically, Judge Brown can now add *Delaney* to the list of wrong guesses. Concluding that 'judicial statesmanship of the highest and proper order' dictated permitting Texas courts to decide the legal issue, and noting that Texas 'has a judicial system which will permit adjudication with dispatch and speed' and 'with its full arsenal of procedural devices * * * will enable the parties to have a prompt and completely sufficient determination,' Judge Brown and his colleagues had again failed to anticipate the state court ruling. Texas refused to hear the case." (Citing United Services Life Ins. Co. v. Delaney, Tex.Civ.App., 386 S.W.2d 648, aff'd., Tex., 1965, 396 S.W. 2d 855). Agata, supra note 7, at 424.

13. See Yarrington v. Thornburg, Del., 1964, 205 A.2d 1, 11 A.L.R.3d 1110, rejecting Truitt v. Gaines, D.Del., 1961, 199 F.Supp. 143; Travelers Ins. Co. v. Auto-Owners (Mut.) Ins. Co., 1964, 1 Ohio App.2d 65, 203 N.E.2d 846, rejecting American Fid. & Cas. Co. v. Indemnity Ins. Co. of North America, 6 Cir., 1962, 308 F.2d 697, Kelly v. State Auto Ins. Ass'n, 6 Cir., 1961, 288 F.2d 734, and Travelers Ins. Co. v. Ohio Farmers Indem. Co., 6 Cir., 1958, 262 F.2d 132.

14. Weed v. Bilbrey, Fla.App., 2d Dist., 1967, 201 So.2d 771, rejecting outright Emerson v. Holloway Concrete Prods. Co., 5 Cir., 1960, 282 F.2d 271, cert. denied, 1961, 364 U.S. 941, 81 S.Ct. 459, 5 L.Ed.2d 372, and expressly adopting the dissent of Brown, J., in the *Emerson* case, 282 F.2d at 278.

15. See, e. g., Life Ins. Co. of Va. v. Shifflet, 5 Cir., 1966, 359 F.2d 501, upholding a jury verdict against the insurance company under the construction of the Florida Insurance Statutes on fraudulent misrepresentation. But then see, 5 Cir., 1967, 370 F.2d 555, granting a motion for rehearing and certifying the question to the Supreme Court of Florida, which in Life Ins. Co. of Va. v. Shifflet, Fla., 1967, 201 So.2d 715, reached a result

opposite from the one reached in the original Fifth Circuit opinion. On receipt of the answer to the certified question, the Fifth Circuit vacated the earlier judgment and remanded the case to the district court. See 380 F.2d 375.

And see especially Hopkins v. Lockheed Aircraft Corp., 5 Cir., 1966, 358 F. 2d 347 in which the Court certified to the Supreme Court of Florida the controlling question of the dollar limitation on damages for wrongful death, a problem presenting fundamental and serious questions of state policy with only fragmentary case materials with which to work. The determination of the question was so difficult, not only for the Federal Court in the light of intervening developments in the law of conflicts but also for the Supreme Court of Florida, that it resulted actually in two opinions before the question was settled. See the opinion at 201 So.2d 743 holding that the situs state dollar limitation was contrary to Florida policy and the opinion at 201 So.2d 749 where, on rehearing, the Court reversed itself to validate the Illinois recovery limitation. No amount of prescience, including that thought by some to come from a Federal Commission, enables a non-Florida Judge authoritatively to determine Florida policy.

16. See Williams, The Role of Federal Courts in Diversity Cases Involving Mineral Resources, 13 Kan.L.Rev. 375, 383–4 (1965), discussing the sequel to Rogers v. Westhoma Oil Co., 10 Cir., 1961, 291 F.2d 726. Despite the issuance of mandamus and, through the voice of my Brother Breitenstein, the strong remonstrance against forum shopping—an ugly word which does not mask that very motive for resort to a Federal rather than local court in an *Erie* case—by this Court in Lutes v. United States District Court, 10 Cir., 306 F.2d 948, on motion for modification, 308 F.2d 574, cert. denied, 1962, 371 U.S. 941, 83 S.Ct. 320, 9 L.Ed.2d 275, the Supreme Court of Oklahoma rejected the *Rogers* reading of the Pugh clause for Oklahoma. Rist v. Westhoma Oil Co., Okl., 1963, 385 P.2d 791.

tions the Chief Judge's statement that "we will, however, comment to the extent that if Kaiser had followed the intricately detailed New Mexico statutory procedure for acquiring land by condemnation, the issues presented and decided here could have been litigated in an orderly manner in the courts of New Mexico where they belong." p. 262. If we were not dealing with, indeed perhaps coming dangerously close to trifling or meddling with serious matters of great public moment and importance to New Mexico, I would be quite willing to breathe some life into that remonstrance to say to Kaiser that having chosen this awkard device it must live with the consequences of a Federal Court diversity determination with all its perils, its pitfalls, and the possibility of its being wrong. But the real peril of this decision is that the victim is in no real sense either party to the cause. The one suffering is the State and its carefully nurtured, domestically contrived public policy.[17] Similarily, the fact that the motion is now made after the adverse decision of this Court, while a powerful circumstance in many situations, does not prevent the exercise of abstention now in view of these great public stakes.[18]

We know one thing for a certainty: the New Mexico "law" on this point is not settled by this case. Denying one of these parties the chance to get a determination now by the only Court which can authoritatively speak brings about one of those curious aberrations of the law in which the only party ultimately hurt is the one who happens to lose the particular case since all others will soon be protected.[19] For the Supreme Court of New Mexico is sure to speak and I would predict that it will speak soon, although I do not know which way it will speak. But considering the difficulty, if not the impossibility of a private litigant securing effective relief from a now already overburdened United States Supreme Court or releasing this Court from the impact of this decision as a matter of stare decisis,[20] about the only virture an immediate decision has

17. Indeed the Attorney General of New Mexico in the relation of the State Engineer in a motion to appear as amicus curiae in effect urges us on behalf of the State of New Mexico to abstain pending determination by its own Courts of Kaiser's declaratory judgment suit field October 30, 1967. On behalf of New Mexico the highest law officer asserts its concern and contends that Kaiser, not the Ranch, is correct in the interpretation of this basic New Mexico law. The motion states:

"(2) The state of New Mexico has a vital public concern in the Court's interpretation and construction of section 75–1–3, * * * in its opinion filed herein October 12, 1967, its interest arising out of the impact of that interpretation of New Mexico law upon the development and distribution of the public waters of the state

It then asserts that the State of New Mexico takes this position on the merits:

"(a) New Mexico law grants the power of eminent domain for the purpose of diverting and conveying water under a valid water right across the lands of others, for application to beneficial use, and the taking of private property for such purposes is a taking for 'public use' under the New Mexico law * * *."

18. It has often been granted by an appellate court, including the Supreme Court. See United Gas Pipe Line Co. v. Ideal Cement Co., 1962, 369 U.S. 134, 82 S.Ct. 676, 7 L.Ed.2d 623, and numerous other cases. As a mater of fact, by formal memoranda to the District Court, copies of which have now been made available to us, Kaiser made a like motion in the event that Judge Bratton had doubts— which he did not—asking that he remand the parties to the state courts for appropriate declaratory relief.

19. "Thus it is that the only person who is hurt is the one who has no effective recourse to correct the error. Cf. Tipton v. Socony Mobil Oil Co., 5th Cir., 1963, 315 F.2d 660, 662, 667 (dissenting opinion), reversed per curiam, 1963, 375 U.S. 34, 84 S.Ct. 1, 11 L.Ed.2d 4." United Services Life Ins. Co. v. Delaney, supra, 328 F.2d at 487. (concurring opinion).

20. See Atlantis Dev. Corp. v. United States, 5 Cir., 1967, 379 F.2d 818, 828; see also Lincoln Nat'l Life Ins. Co. v. Roosth, 5 Cir., 1962, 306 F.2d 110 (en banc), cert. denied, 372 U.S. 912, 83 S. Ct. 726, 9 L.Ed.2d 720.

is that it is done. It is done now and delay is avoided. Delay, to be sure, is a thing we all strive to avoid and overcome. But what else is served? Is there any virtue in decision now simply for the sake of decision if—and that if is a very big one—the public importance of the question is certain soon to drive other litigants to the New Mexico Courts where the outcome may well be quite different? But different or not, authoritative decision will be made for the first time.

In the look back—even in the eyes of the pedagogical purists—about the only virtue it will have is that someone did his duty in the *Winter Haven* sense.[21] In the meantime, of course, Kaiser and Ranch know their rights. But no one else, and certainly not New Mexico, knows. Nor will they until New Mexico speaks. Why not listen?

---

21. From the standpoint of judicial administration in a substantive sense the outcome brings to mind Judge Friendly's lamentations " 'The compulsion felt by my brothers * * * to reach what seems a palpably unjust result reminds me of Chief Justice Erle's observation as to the occasional predilection of the best of judges for "a strong decision," to wit, one "opposed to common sense and to common convenience." * * *.' Spanos v. Skouras Theatres Corp., 2 Cir., 1966, 364 F.2d 161, 167." Lawrence v. United States, 5 Cir., 1967, 378 F.2d 452, 467 n. 44.